Document Number Case Number
03-C-0473-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
07/30/2004 08:35:21 AM CDT

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

EDWARD G. KRAIMER, Jr.,
GERALD J. MORRELL, GRAND DADDY'S, LLC,
and
KRAIMER PROPERTIES, LLC,

        Plaintiffs,

    v.                        Case No. 03 C 0473 C

CITY OF SCHOFIELD,

        Defendant.

## BRIEF IN SUPPORT OF PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

In this civil action, brought pursuant to 42 U.S.C. § 1983, the plaintiffs, who operate a tavern in Schofield and have been trying for over a year to present nude dance entertainment there, seek equitable, declaratory, and injunctive relief to prevent further enforcement of the defendant City of Schofield's ordinance provisions that restrict adult-oriented expression and to return plaintiffs to the position that they would have occupied had it not been for defendant's already unlawful application of its ordinances. The plaintiffs also seek compensatory

damages for injuries including their loss of freedom of expression and lost profits.

This motion for summary judgment seeks a ruling that (1) the regulatory scheme to which the plaintiffs were subject in April 2003 and (2) the scheme to which they are now subject are both unconstitutional. Should the plaintiffs prevail the on any liability issue, they will then seek damages and, where appropriate, injunctive relief.

## SUMMARY OF THE CASE

On April 28, 2003, the plaintiffs applied for a Public Entertainment/Exhibition License as a Nonliquor Licensed Establishment, pursuant to Schofield Ordinance §11.22. (Complaint, ¶ 403; admitted in Defendant's Answer, ¶ 8.) They were told by a city clerk that they would also need to apply for a conditional use permit. The rationale for this additional requirement, which the plaintiffs did not learn of until discovery in this case, was that the City had decided to treat the business the plaintiffs described in their entertainment license application as an Indoor Theatre, and this was a denominated a conditional use in the C-1 zoning district where the plaintiff's business was located.

On May 16, 2003, the plaintiffs applied for a conditional use permit, seeking to operate at their location as a non-alcohol serving operation offering erotic dancing entertainment. (Complaint, ¶ 404; admitted in Answer, ¶ 9.) Both applications were denied by the Schofield

2

City Council on June 10, 2003. (Complaint, ¶ 407; admitted in Answer, ¶ 12.)

On July 24, 2003, the Schofield City Council enacted an amendment to its zoning code, § 10.15(6)(g), which became effective on July 28, 2003. (Complaint, ¶ 409; admitted in Answer, ¶ 14.) Section 10.15(6)(g) created a new category of adult oriented establishment which is a permitted use only in zoning districts I-1, and I-2, the industrial districts. (Complaint, ¶ 410; admitted in Answer, ¶ 14.)

The plaintiffs filed suit on September 5, 2003, asserting that both the zoning code provisions under which their conditional use permit had been denied (hereinafter, "the Indoor Theatre zoning scheme") and the newly enacted zoning provision, § 10.15(6)(g)(hereinafter "the new zoning provision), were facially unconstitutional and unconstitutional as applied. The complaint also asserts that Schofield's Adult Entertainment Ordinance, § 16.03 and its Public Entertainment/Exhibition Licensing Ordinance, §11.22, are facially unconstitutional. The defendant filed its Answer on November 5, 2003.

On November 10, 2003, the plaintiffs filed a motion seeking preliminary injunctive relief to prevent the defendant from enforcing the Public Entertainment/Exhibition Licensing Ordinance, §11.22, against them while this lawsuit is pending. The plaintiffs later withdrew that motion when the defendant agreed not to enforce §11.22. On December 9, 2003, the defendant repealed §11.22.

3

On June 30, 2004, the parties deposed each other's witnesses. On July 21, 2004, the Court granted plaintiffs' motion file an Amended and Supplemented Complaint.

## STATEMENT OF FACTS

All the facts upon which the plaintiffs rely are contained in the Plaintiffs' Proposed Findings of Fact.  In the interest of economy, those facts are not repeated here.

## ARGUMENT

## I.   SUMMARY OF THE PLAINTIFFS' ARGUMENTS

The plaintiffs assert that the Public Entertainment/Exhibition Ordinance, §11.22[1], which required a permit before virtually any type of public entertainment was allowed, was both unconstitutionally overbroad and an unconstitutional prior restraint that allowed unbridled discretion in determining whether to grant a license and also failed to provide required procedural safeguards.  The plaintiffs assert that the Adult Entertainment

---

[1] Relevant portions of §11.22 are listed at ¶¶ 59- 66 in the Plaintiffs' Proposed Findings of Fact.  The ordinance in its entirety is attached to the deposition of Schofield Zoning Administrator King as Exhibit 11, and to the Declaration of Jeff Scott Olson as Appendix 1.

Ordinance, §16.03 [2], is also unconstitutionally overbroad, and in any event, was repealed in July, 2003, with the passage of the zoning code amendment, the Adult Oriented Establishment provision, which conflicts with the Adult Entertainment Ordinance and provides for repeal of any ordinances that conflict with it.

It is further the plaintiffs' contention that the Indoor Theatre zoning scheme[3], by requiring a conditional use permit for indoor theatres, acts as an invalid prior restraint because there are no time limits on the actions required to be performed by the Plan Commission (which, by law, must precede the City Council's final decision on the application), and because the standards upon which the decision must be made allow unbridled discretion on the part of the City Council in determining whether to grant the conditional use permit. The plaintiffs contend that but for the application of these unconstitutional regulations, they would have been operating legitimately with nude dance entertainment before the City passed its amendment to the zoning code in July, 2003, and therefore, they would have been grandfathered under the new zoning code provisions, § 10.15 (6)(b)(36) and

---

[2] Relevant portions of §16.03 are listed at ¶¶ 67-77 in the Plaintiffs' Proposed Findings of Fact. The ordinance in its entirety is attached to the deposition of Schofield Zoning Administrator King as Exhibit 12 and to the Declaration of Jeff Scott Olson as Appendix 2.
[3] Relevant portions of the zoning code are listed at ¶¶ 78-94 in the Plaintiffs' Proposed Findings of Fact. The code in its entirety is attached to the deposition of Schofield City Attorney Freeburg as Exhibit 16.

§10.15(6)(g)[4], entitled Adult-Oriented Establishment, and would have been able to lawfully continue offering nude dance entertainment as a nonconforming use in spite of the new zoning provisions.

The plaintiffs also argue that they presently continue to be burdened by the unconstitutional application of the Indoor Theatre zoning scheme in that they have been denied a building permit because they are again deemed to be an indoor theater, a conditional use, and have not reapplied for a conditional use permit.  Inasmuch as the provisions of the zoning code that make presenting entertainment a conditional use are an unconstitutional prior restraint, and *a priori* invalid, such a burden is also unconstitutional.

Finally, the plaintiffs assert that the new zoning code provisions are overbroad and do not meet the *Renton/Alameda Books* criteria required of time, place, and manner regulation of expression.

## II.    THE STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[4] Relevant portions of the new zoning provisions are listed at ¶¶ 95- 107 in the Plaintiffs' Proposed Findings of Fact.  The provisions in their entirety are attached to the Declaration of Attorney Olson.

A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In evaluating a motion for summary judgment, the Court must draw all inferences in favor of the nonmoving party. *Id.* at 587.

## III.   THE PLAINTIFFS HAVE STANDING TO CHALLENGE THE FACIAL CONSTITUTIONALITY OF THE CITY'S ORDINANCES.

As a preliminary matter, although the defendant has not challenged the plaintiffs' standing to litigate their challenges to the validity of the city's several ordinances, the plaintiffs will briefly address standing before moving to the substantive issues. The plaintiffs base their claim for standing both on their own injuries as well as upon the injuries of third parties not before the court.

The plaintiffs challenge §11.22, §16.03, and the new zoning provision on grounds of overbreadth.  The overbreadth doctrine represents "a departure from the traditional rules of standing." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Under this doctrine a plaintiff may "challenge a statute on its face because it also threatens others not before the court – those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution..." *Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987).

The Supreme Court reasoned that laws that may have a deterrent effect on free expression should be subject to challenge even by a party whose own conduct may be subject to regulation by a more narrowly drawn ordinance. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984).  The Court has repeatedly held that a statute may be challenged on its face even though a more narrowly drawn statute might be valid as applied to the party in the case before it.  *Gooding v. Wilson,* 405 U.S. 518, 520-21 (1972); *Dombrowski v. Pfister,* 380 U.S. 479, 494 (1965).  If there is a "realistic danger" that the ordinance will "significantly compromise" First Amendment protections of persons not before the court, it may be facially challenged on overbreadth grounds.  *Broadrick*, 413 U.S. at 613. This exception to the normal rules reflects "the transcendent value to all society of protected expression" as well as society's concerns that free speech will be chilled.  *Bigelow v. Virginia*, 421 U.S. 809, 816 (1975).

The plaintiffs also assert that §11.22 and the Indoor Theatre zoning scheme are unconstitutional prior restraints that allow unbridled discretion in decisionmaking.  The Supreme Court has held that "when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially...." *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755.

In *FW/PBS v. City of Dallas*, 493 U.S. 215 (1990), where the Supreme Court examined a comprehensive zoning and licensing ordinance that regulated adult entertainment, the Court noted:

> [P]etitioners raise a facial challenge to the licensing scheme.  Although facial challenges to legislation are generally disfavored, they have been permitted in the First Amendment context where the licensing scheme vests unbridled discretion in the decision maker and where the regulation is challenged as overbroad. . . .

493 U.S. at 222  (internal citations omitted)

The plaintiffs base their standing on their own injuries as well. The essence of standing is the ability to benefit in some concrete manner from a favorable decision.  To demonstrate standing, a plaintiff must show:  (1) injury in fact (the "actual or imminent invasion of a concrete and particularized interest"); (2) causation (a "causal connection between the defendant's actions and the injury"); and (3) redressability (the "likelihood that the injury is redressable by a favorable court decision"). *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103-04 (1998); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992); *Tobin for Governor v. Illinois State Board of Elections*, 268 F.3d 517, 527 (7th Cir. 2001), cert. denied 535 U.S. 929 (2002).

The requirement that a plaintiff have an injury in fact is an "undemanding" one. *Family & Children's Center, Inc. v. School City of Mishawaka*, 13 F.3d 1052, 1058 (7th Cir. 1994).  Even the *threat* of invasion of a legally protected interest is adequate to confer standing.

*Valley Forge Christian College v. Ams. United for Separation of Church & State,* 454 U.S. 464, 472 (1982). See e.g., *Clarkson v. Town of Florence*, 198 F.Supp. 2d 997, 1003 (E.D.Wis. 2002), where the fact that the town clerk had advised plaintiff that she would lose her liquor license if she continued to present erotic dancing was sufficient injury to establish standing.

Here, the plaintiffs applied for and were denied both a license under §11.22 and a conditional use permit under the zoning code.  They are precluded from offering nude dance at their tavern by the provisions of §16.03 and the new zoning provisions.  As a result of these regulations and the plaintiffs' efforts to comply with them, the plaintiffs have censored themselves by refraining from presenting the dance entertainment that they had intended.  Therefore, they have suffered a compensable injury that affords them standing to challenge the constitutionality of the subject ordinances on their own behalves.  A ruling by this Court that the regulations are unconstitutional will entitle the plaintiffs to damages in compensation for the loss of their exercise of freedom of expression as well as for economic losses suffered.  A damage award is appropriate to compensate for injuries "caused by the deprivation of constitutional rights."  *Carey v. Piphus*, 435 U.S. 247, 254 (1978). See also, *Irish Lesbian and Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2nd Cir. 1998) (Denial of opportunity to express one's view can give rise to a compensable injury.)

This potential for a remedy if there is a favorable ruling provides standing to challenge the constitutionality of the various ordinances under the *Lujan* standard.

## IV.   THE SCHOFIELD PUBLIC ENTERTAINMENT/EXHIBITION ORDINANCE, § 11.22, WAS FACIALLY UNCONSTITUTIONAL.[5]

### A.   The Ordinance was Overbroad.

Ordinances which regulate First Amendment activities must be narrowly drafted to address only the specific evil sought to be prohibited. *Broadrick*, 413 U.S. at 611.  Because First Amendment freedoms "need breathing space to survive, government may regulate in the area only with narrow specificity."  *NAACP v. Button*, 371 U.S. 415, 433 (1963).  A statute is unconstitutional on its face if there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court. . . ."  *Taxpayers for Vincent*, 466 U.S. at 501.  Only an ordinance that has real and substantial overbreadth problems will be invalidated, however, as the Supreme Court has held, "the overbreadth doctrine is 'strong medicine'."  *New York v. Ferber*, 458 U.S. 747, 769 (1982).  If an overbreadth

---

[5] This ordinance was repealed in December, 2003. Accordingly, injunctive relief is no longer sought in connection with its enforcement.  However, the plaintiffs were subject to and damaged by this ordinance from at least April, 2003 until its repeal some seven months later, so they still have a cause of action for damages for that period of time.  *Clarkson*, 198 F.Supp. 2d at 1004-05.  The ordinance, during that period of time, prevented the plaintiffs from presenting even the bikini dancers they immediately began to offer when the City determined to repeal it

challenge is successful, "any enforcement" of the regulation found unconstitutional is "totally forbidden." *Broadrick*, 413 U.S. at 613.

An overbreadth analysis starts with the proposition that the government may prohibit or regulate expressive activity which can be plausibly believed to cause adverse secondary effects, such as increased crime rates or decreased neighboring property values, but where expressive activity cannot plausibly be believed to cause such secondary effects, the government may not regulate or prohibit it:

> When the government restricts speech not associated with harmful secondary effects, then the government cannot be fairly said to be regulating with those secondary effects in mind, and the regulation extends beyond its legitimate reach.

*Schultz v. City of Cumberland,* 228 F.3d 831, 849 (7th Cir. 2000). An enactment which is so broadly written that it prohibits forms of expressive activity that cannot plausibly be believed to cause secondary effects is invalid for overbreadth. *Id; Wil-Kar, Inc. v. Village of Germantown,* 153 F.Supp. 2d 982, 991 (E.D.Wis. 2001).

In *Schultz*, the Court examined the City of Cumberland's ordinance that regulated nude dance and found that the language which defined an adult cabaret as one which "regularly features persons who appear in a state of nudity or semi-nude," might include a venue which shows the Broadway musical *Hair* on a regular basis as well as a tavern featuring striptease dancers and thus was overbroad. *Schultz*, 228 F.3d at 849-850.

12

The Court was able to save the ordinance only by applying a narrowing construction to the word "regularly," reading it to mean "always" and thereby limiting the reach of the ordinance to establishments that were truly "adult-entertainment establishments" and could thus be legitimately regulated. *Id.* In the Public Entertainment/Exhibition Licensing Ordinance, §11.22, there is no language by which the reach of the ordinance can be so limited.

The Public Entertainment Ordinance was overbroad in several respects, but the most obvious is that the specification of activities for which a license is required was too broad. Every type of expressive entertainment, including theatrical performance, art exhibitions, and instrumental music, was forbidden unless approved and licensed by the government. Expressive activity having nothing to do with sexuality or nudity was prohibited without a license. §11.22 (a)(1) and (b)(1).  There is no credible reason to believe that these sorts of expressive conduct are in any way related to adverse secondary effects.

The inclusion of 'exhibition' as one of the public entertainments that require licenses makes it clear that the ordinance is not limited to regulating live performances but also includes television programs, sculpture and art exhibits.  In analyzing the meaning of the ordinance, the Court is required to use established principles of statutory construction.  To determine the intent of the legislative body, a court first looks to the language it has chosen; if the language is clear, the court

may go no further. *Pittway Corporation v. United States*, 102 F.3d 932, 934 (7th Cir. 1996).  *See*, *Town of Munster, Indiana v. Sherwin-Williams*, 27 F.3d 1268, 1271 (7th Cir. 1994) ("When the words of the statute are unambiguous, the judicial inquiry is complete."). *See also, Schultz,* 228 F.3d  at 849 ("The plain language of the Ordinance determines whether [the] Section…is overbroad.").

If nontechnical words which are not defined are used in an ordinance, "they should be accorded their commonly accepted meaning." *United States v. Cooper*, 19 F.3d 1154, 1165 (7th Cir. 1994); *Weber v. Town of Saukville*, 197 Wis.2d 830, 541 N.W.2d 221, 224 (Ct.App. 1995). This meaning may be established by reference to dictionary definitions. *Id.*  "Exhibition" is defined as, "any public show; a display, as of works of art or feats of skill or of oratorical or dramatic ability; a public display, esp. of objects of art, manufacture, commerce, etc., as the annual exhibition of the Academy of Fine Arts." *Webster's New International Dictionary, Unabridged*, 2nd Ed, p. 893.

Employing the common usage of the term "exhibition", it is apparent that the scope of the ordinance is not limited to live acts.  The Wisconsin Supreme Court has ruled that where artistic works and exhibitions involving nudity would have been prohibited by a town ordinance, yet could not plausibly be believed to cause adverse secondary effects on the surrounding neighborhoods, the failure of its drafters to limit its application to live events renders such an ordinance

14

overbroad:

> [S]everal hypothetical situations exist in which the Ordinance would impinge on protected expression involving public nudity. Such examples include public exhibition of artwork or artifacts depicting nudity, [and the] public display of a television program including brief nudity.
>
>       *     *     *     *
>
> The Ordinance does not limit itself to live nudity - it apparently applies to all forms of nude depiction. Accordingly, the Ordinance regulates expressive conduct protected by the First Amendment to the United States Constitution that has no connection to the potential harmful secondary effects arising from nude dancing in liquor licensed establishments and it does so in a real and substantial manner.

*Lounge Management v. Town of Trenton,* 219 Wis.2d 13, 25-26, 580 N.W.2d 156 (1998).  The ordinance under examination here is far more seriously flawed, inasmuch as it regulated not only nude exhibitions, but *all* exhibitions.  It further regulated such innocuous entertainments as singing and playing prerecorded music.

> **B.    The Ordinance Allowed Unbridled Discretion in the Decision Whether to Grant or Deny an Application.**

A regulation is considered a prior restraint when it makes the enjoyment of protected expression contingent upon first obtaining the permission of government officials.  *Near v. Minnesota*, 283 U.S. 697, 713 (1931). See also, *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975) (a "prior restraint" is any regulation that gives "public officials

the power to deny use of a forum in advance of actual expression.")
Essentially, where a business is required by law to refrain from
disseminating adult entertainment unless and until it receives a
government license to do so, there exists a prior restraint. *Essence, Inc, v.
City of Federal Heights*, 285 F.3d 1272, 1289-90 (10th Cir. 2002).

In *FW/PBS*, the Court identified "unbridled discretion" in regard to
whether to grant an application for license as an evil that "will not be
tolerated" in a prior restraint scheme. 493 U.S. at 225. The Court has
continually held that any prior restraint "without narrow, objective, and
definite standards to guide the [licensing] authority" is unconstitutional.
*Shuttlesworth v. Birmingham*, 394 U.S. 147, 150 (1969). The "unbridled
discretion" requirement means that whenever the city seeks to regulate
freedom of expression by requiring a license or permit in advance of its
presentation, the regulation must have objective, discernible standards to
govern the decisions to grant or deny applications, and the city must
adhere very narrowly to the explicit terms of the ordinance.   *City of
Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750 (1988).

Section 11.22 (c) (2) (dd) required the Council to approve the
license whenever it found: (1) all the statements in application were true;
(2) the applicant was "of good moral character and reputation"; (3) the
premises would comply with all applicable regulations, including zoning,
building code and fire prevention code; (4) the proposed entertainment
would comply with all applicable regulations including but not limited to

"noise limitations and performance standards;" (5) a corporate applicant was licensed to do business and in good standing with the state; and (6) "the applicant [wa]s otherwise entitled to a license under the other provisions" of the ordinance.

The standard that required the City Council to find that the applicant was of "good moral character and reputation" before granting a license left the Council with unbridled discretion to deny a license to anyone whose message it disfavored. In *Shuttlesworth*, a licensing ordinance which allowed an official to deny a permit if issuance would threaten "the public welfare, peace, safety, health, decency, good order, morals or convenience" of the community was held to vest "virtually unbridled and absolute power in the licensing authority." *Shuttlesworth*, 394 U.S. at 149-150. As the Seventh Circuit has noted, the Supreme Court has "unfailingly condemned" regulations which grant government officials "standardless carte blanche" to permit or prohibit protected expression. *Graff*, 9 F.3d at 1329 (plurality opinion), citing *Shuttlesworth, Freedman, and Thornhill v. Alabama*, 310 U.S. 88 (1940). See also, *MGA Susu v. County of Benton*, 853 F.Supp. 1147, 1152-1153 (D.Minn. 1994) (standard that proposed use not be "adverse to the morals and general welfare" of residents. . . .  found unconstitutional because it affords decision makers discretion to deny a permit based on the content of an applicant's speech).

17

**C.  The Ordinance was an Unconstitutional Prior Restraint Because it Lacked the Requisite Procedural Safeguard of Brief and Certain Time Limits for Granting or Denying Licenses.**

Prior restraints are not unlawful, per se, but they are "presumptively unconstitutional." *FW/PBS*, 493 U.S. at 225. Because a prior restraint carries with it the inherent danger of censorship which may be made more onerous because of delay, such a regulation is required both to limit the time within which the decision maker must issue a license or permit and also to provide prompt judicial review of an adverse decision.  *Id.* at 225-26. In *FW/PBS*, the Court concluded that in the context of a licensing scheme which regulates adult-oriented businesses, two procedural safeguards are "essential," i.e. that any restraint prior to judicial review be imposed only for a brief specified time period and that expeditious judicial review must be available. *FW/PBS*, 493 U.S. at 228. The Supreme Court has recently reiterated its commitment to the proposition that a law that functions as a prior restraint on protected expression is permissible under the First Amendment only if it provides adequate procedural safeguards that guarantee that an application for licensing of expression will receive prompt attention and review. *City of Littleton v. Z.J. Gifts*, __ U.S. __, 124 S.Ct. 2219 (2004).

Although there were time limits sprinkled throughout the Public Entertainment ordinance, (for example, a request to change previously approved entertainment had to be approved or denied within 60 days),

18

there was no time limit at all within which the original application for a license had to be granted or denied.

Furthermore, inspections and investigations were required before the application would be reviewed by the City Council. The City Clerk was required to "give consideration to" the reports of the inspectors, before forwarding them to the Council, and there were no time limits for these processes. §11.22(c)(2)(cc)(2) and 11.22(c)(2)(dd). Each step of the process had the potential to mire the application in a delay of indefinite duration.

**V.    THE SCHOFIELD ZONING SCHEME IS FACIALLY UNCONSTITUTIONAL BECAUSE IT IDENTIFIES A CLASS OF BUSINESSES, INDOOR THEATERS, BY THEIR EXERCISE OF THEIR FIRST AMENDMENT RIGHT OF FREE EXPRESSION, AND REQUIRES THEM, BUT NOT ALL BUSINESSES, TO OBTAIN A CONDITIONAL USE PERMIT.**

When one seeks to present any type of entertainment in Schofield, be it Shakespearean drama, a classical piano recital, a poetry reading, or burlesque dance, if that entertainment is offered in sufficient quantity, the place in which it is presented will be deemed an indoor theater. And if this entertainment is to be presented in Schofield's commercial zone, C-1, the presenter must obtain a conditional use permit before such expression may lawfully be offered. (Plaintiffs' Proposed Findings of Fact, hereinafter "PPFOF" #'s 26-27)

A conditional use permit may be granted "only by the Common Council after public hearing and written recommendation by the City Plan Commission." § 10.03 (82). The City Plan Commission is required to

19

hold "at least one public hearing" on the proposed conditional use. § 10.10 (4).  After the public hearing, the Plan Commission reports its findings and recommendations to the City Council. § 10.10 (5). If an application is not acted upon by the City Council within 90 days of the date on which the Council receives the application (with the findings and recommendations of the Plan Commission), it is deemed to have been denied. § 10.10 (5).

No conditional use may be recommended by the Plan Commission unless it finds: (a) that the operation of the conditional use will not be detrimental to the "public health, safety, morals, comfort or general welfare;" (b) that the conditional use will not injure the use and enjoyment of other property in the immediate vicinity for purposes already permitted nor substantially diminish property values; (c) that the establishment of the conditional use will not impede the normal and orderly development and improvement of surrounding property; (d) that adequate utilities, access roads, drainage and necessary facilities are provided; (e) that adequate measures will provide ingress and egress to minimize traffic congestion; and (f) that the conditional use shall, in all other respects, conform to the applicable regulations. § 10.10 (6).

**A. The Zoning Code Requirement of a Conditional Use Permit For an Indoor Theater in the C-1 Zoning District Must Be Analyzed as a Prior Restraint.**

The plaintiffs' tavern is located in C-1, First Commercial District. (PPFOF #'s 2, 24) As the zoning code allows the regular presentation of public entertainment, i.e. an "indoor theater", only as a conditional use, it operates as an unlawful prior restraint in that respect because the code allows city officials to exercise unbridled discretion in determining whether or not to grant an application for conditional use permit.[6] "In the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood*, 486 U.S. 757.

Although it is a zoning ordinance, which is most often analyzed as a time, place and manner regulation, where Schofield's zoning code makes the repeated expression of any of the performing arts contingent upon receipt of the conditional use permit, it acts as a prior restraint. There is ample case law that demonstrates that even a time, place and manner regulation which is nominally a zoning ordinance may also be a prior restraint and thus may be subject to the strict constitutional tests which the law imposes on prior restraints upon protected expression.

---

[6] The 'unbridled discretion' standard is not limited to prior restraints but applies to every type of law that restricts freedom of expression. "Even a content-neutral time, place and manner ordinance must contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas v. Chicago Park District*, 534 U.S. 316, 323 (2002)

In *Special Souvenirs, Inc. v. Town of Wayne*, 56 F.Supp. 2d 1062, 1085 (E.D. Wis. 1999), the court explained, "If...the particular zoning scheme effectively requires governmental permission before an adult-oriented business may engage in protected activity, then otherwise valid time, place and manner restrictions are analyzed as prior restraints." In *11126 Baltimore Blvd., Inc. v. Prince George's County, Maryland*, 58 F.3d 988 (4th Cir. 1995), cert. denied, 516 U.S. 1010, overruled in part on other grounds by *City of Littleton v. Z.J. Gifts*, __ U.S. __, 124 S.Ct. 2219 (2004), the Fourth Circuit Court of Appeals, sitting *en banc*, refuted the argument of the county that its adult bookstore ordinance was a "mere" zoning ordinance designed to control the secondary effects of adult bookstores and that therefore a prior restraint analysis need not be conducted, finding that:

> [T]he Court has made clear that otherwise valid content-neutral time, place, and manner restrictions that require governmental permission prior to engaging in protected speech must be analyzed as prior restraints and are unconstitutional if they do not limit the discretion of the decision maker and provide for . . . procedural safeguards.

*Id.* at 995, quoting *FW/PBS*, 493 U.S. 215, 225 (1990).

The prior restraint analysis has routinely been applied where a city requires conditional use permits prior to the presentation of live entertainment. In *3570 East Foothill Blvd., Inc. v. City of Pasadena*, 912 F.Supp. 1268 (C.D. Cal. 1996), the court considered a facial constitutional

challenge to Pasadena's conditional use permit and live entertainment permit ordinances, and it analyzed both zoning ordinances under prior restraint analysis because the ordinances required the permittee to obtain the government's permission or approval before engaging in an act of speech. *Id.* at 1273. In a similar analysis, the District Court of Minnesota found that the requirement of a conditional use permit which was required of all live theaters, cinemas, and other recreational facilities imposed a prior restraint. *MGA Susu, Inc*, 853 F.Supp. at 1151.

Like the ordinances examined in the cases cited above, Schofield's zoning scheme that designates an indoor theaters as a conditional use requires permission from the government in advance of the presentation of dancing entertainment; therefore, it constitutes a prior restraint and must be analyzed as such.

### B. The Conditional Use Permitting Scheme is an Unconstitutional Prior Restraint Because it Allows City Officials Unbridled Discretion in Determining Whether to Grant or Deny an Application for a Conditional Use Permit.

The plaintiffs' challenge to the conditional use permitting scheme is that it permits unbridled discretion in three regards. First, some of the standards expressly allow officials to make value judgments about the nature of the entertainment to be offered. Secondly, some of the criteria for granting a license are vague and subjective, leaving officials with unbridled discretion to deny a permit ostensibly based upon some pretext

but actually because of personal animosity for the message to be disseminated. Finally, the permitting provision lacks a necessary procedural safeguard: a guarantee that the decision to grant or deny a permit would be made in a brief, certain period of time.

### 1. expressly allowed value judgments

One of the standards by which an application for a conditional use permit for an indoor theater is to be judged is a determination that the operation of the conditional use will not be detrimental to the "public health, safety, morals, comfort or general welfare." §10.10(6). Use of a value-laden criterion such as "detrimental to morals" has been expressly forbidden by the Supreme Court. See, e.g. *Staub v. City of Baxley*, 355 U.S. 313, 321 (1958) (law unconstitutional where denial of permits could be based on character of applicant, nature of organization's business and "its effects upon the general welfare of citizens of the [c]ity...."); *Shuttlesworth*, 394 U.S. at 149-50 (unbridled discretion found where permit for demonstration or parade could be denied if, in the city's judgment, "public welfare, peace, safety, health, decency, good order, morals or convenience" require denial.); *3570 East Foothill Blvd., Inc.*, 912 F.Supp. at 1275 (The court deemed unconstitutional as vesting city officials with "unbridled discretion to grant [or deny] permits" the provision in zoning ordinance which allowed denial of conditional use permit if the proposed use would be "detrimental to the public health, safety, or welfare of persons residing or working adjacent to the

24

neighborhood of such use."); *MGA Susu,* 853 F.Supp. at 1152-1153 ("adverse to the morals and general welfare" standard unconstitutional because it affords discretion to deny permit based on the content of an applicant's speech). Under the law as written, the city would be allowed to deny a permit to any entertainment it found detrimental to public morals – this would be the very essence of prohibited censorship in a prior restraint.

### 2. vague and subjective criteria

Two dangers that inure to a discretionary licensing scheme are (1) self-censorship by the potential permittee, undertaken to avoid being denied a license to speak; and (2) the difficulty of "effectively detecting, reviewing, and correcting content-based censorship 'as applied' without standards by which to measure the censor's action." *City of Lakewood*, 486 U.S. at 759. Explaining the need for specificity and objectivity in standards to prevent self-censorship, the Supreme Court said:

> The mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused…. Only standards limiting the licensor's discretion will eliminate this danger by adding an element of certainty fatal to self-censorship.

*Id.* at 757-58. The second risk occurs because the grant of wide discretion in a licensing decision increases the difficulty of determining whether an application of the law was a "licensor's legitimate denial of a permit" or a licensor's "illegitimate abuse of censorial power":

> Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.... In sum, without standards to fetter the licensor's discretion, the difficulties of proof and the case-by-case nature of 'as applied' challenges render the licensor's action in large measure effectively unreviewable."

*Id.* at 758-59. Put more simply, "[W]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." *Thomas*, 534 U.S. at 323.

Some of the standards used to determine whether to grant a conditional use permit under the Schofield zoning code, especially catch-all amorphous criteria such as "comfort" or "general welfare" are too vague to provide the type of objective standards required to prevent self-censorship, to prevent a censorious denial of a permit from masquerading as a legitimate decision, or to guarantee that a decision can be reviewed effectively. Vague language permits unbridled discretion, and indeed, many cases which discuss the two issues use the concepts of vagueness and unbridled discretion interchangeably. See, *e.g., Bledsoe v. City of Jacksonville Beach*, 20 F.Supp.2d 1317, 1325 (M.D. Fla 1998) (even assuming the government agent making the decision is a fine

enforcement officer, the vague language which delegates to him decisions to be made on an *ad hoc* basis violates the First Amendment), and *Elam v. Belva Bolling*, 53 F.Supp.2d 854, 862 (W.D.Va. 1999) ("the use of vague terms opens the Ordinance up to the possibility of wide-spread abuse and makes the peaceful enjoyment of the freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official.")

Language similar to that used in the Schofield ordinance has been found too subjective to adequately curtail discretion. See, e.g. *Ellinos, Inc. v. Austintown Township*, 203 F.Supp. 2d 875, 884 (N.D.Ohio 2002)(Where town applied general standards to adult business' application for conditional use permit, requirements that proposed use be "harmonious and appropriate in appearance"  while not changing "the essential character" of the surrounding area  were found so imprecise that they could empower the Board to "covertly discriminate against sexually oriented businesses under the guise of subjective appropriateness and community general welfare considerations"); *Dease v. City of Anaheim*, 826 F.Supp. 336, 344 (C.D.Cal. 1993)(Where zoning ordinance required conditional use permit for adult entertainment which could be granted only if proposed use would not be detrimental to the "peace, health, safety, and general welfare" of the area, the decision to grant or deny conditional use permit was "not guided by definite and objective standards" and was therefore an unconstitutional prior

27

restraint.); *Diamond v. Taft*, 29 F.Supp.2d 633, 648 (E.D.Cal. 1998)(conditional use scheme that allowed adult businesses where "desirable to the public convenience or welfare and in harmony with the elements and objectives of the General Plan" was found "too broad to meaningfully limit the discretion of city officials.")

The broad discretion is exacerbated by another provision that allows the City Council to impose "such conditions and restrictions upon the establishment, location, construction, maintenance and operation of the conditional use as is deemed necessary for the protection of the public interest ...." §10.10(7). where a prior restraint vests officials with the power to attach broad terms and conditions, this, too, constitutes unbridled discretion. *U.S. v. Linick*, 195 F.3d 538, 541-542 (9th Cir. 1999), citing *Lakewood*, 486 U.S at 769. *See also, Special Souvenirs v. Town of Wayne*, 56 F.Supp.2d 1066, 1088 (E.D.Wis. 1999) (ability of zoning board to attach conditions it "deems necessary to fulfill the purpose and intent" of ordinance fails to provide sufficient objective standards to limit discretion), and *New Jersey Freedom Organization v. City of New Brunswick*, 7 F.Supp.2d 499, 513 (D.N.J. 1997) (even where discretion is limited to objective factors, the ability to impose special conditions on permit applicants renders unclear the limits actually imposed on officials and the ordinance is unconstitutional); *Ellinos*, 203 F. Supp. 2d at 884, n. 8 (discretion heightened by additional provision allowing Board to impose additional conditions in granting conditional use permit.)

### 3. no brief certain time limits

Licensing schemes that confer an unlawful degree of discretion upon licensors include those that create a "risk of delay such that every application of the statute creates an impermissible risk of suppression of ideas." *FW/PBS,* 493 U.S. at 223-24 (internal quotes omitted).  See also, *City of Lakewood*, 486 U.S. at 759 (Discretion to delay licensing decision "gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers."); *Lady J. Lingerie v. City of Jacksonville,* 176 F.3d 1358, 1362 (11th Cir. 1999), cert. denied, 529 U.S. 1053 (2000)("[T]he opportunity for public officials to delay is another form of discretion."); *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 889 (6th Cir. 2000), overruled  in part on other grounds by *City of Littleton v. Z.J. Gifts*, __ U.S.___, 124 S.Ct. 2219 (2004)("A form of unbridled discretion is the failure to place brief, specific time limits on the decision-making process.")

The Schofield regulations for considering an application for a conditional use permit contain numerous areas where delay could stall a decision.  The zoning code requires that there be "at least one public hearing," but places no time limits on when the hearing must be held. (PPFOF #'s 31-32, 86) The code requires the Plan Commission to prepare findings and a recommendation, without which the City Council cannot act upon an application, but sets no time limits within which such

findings must be issued. (PPFOF # 33)  There is only one time limit mentioned – if the City Council fails to act within 90 days of its receipt of the Plan Commission recommendation, the application is deemed denied (PPFOF # 88) – but this is too little, too long, and too late in the process to prevent opportunity for public officials to censor by delay.

**VI.    WITHOUT THE APPLICATION OF THE UNCONSTITUTIONAL PUBLIC ENTERTAINMENT AND CONDITIONAL USE REGULATIONS, THE PLAINTIFFS WOULD HAVE BEEN OFFERING NUDE DANCE, AND SUCH AN OPERATION WOULD NOW BE A LAWFUL NONCONFORMING USE.**

Had the plaintiffs been allowed freedom of expression without the interference of the unconstitutional public entertainment restriction and conditional use schemes, they would have begun offering nude dance in April 2003.  (PPFOF #57, 58) In July, 2003, the city passed the new zoning provision that makes nude dance entertainment unlawful at the plaintiffs' location.  However, to put the plaintiffs in the position that they would have been in but for the use of unconstitutional regulations, they must be given the benefits of "grandfathering" and allowed to operate as a nonconforming use.

A zoning law cannot be given retroactive application if it would prohibit an otherwise lawful use. *Des Jardin v. Town of Greenfield, et. al.*, 262 Wis. 43, 53 N.W.2d 754 (1952).   A nonconforming use is a use of land for a purpose which is not permitted in the district in which the land is situated." *Waukesha County v. Seitz*, 140 Wis. 2d 111, 409 N.W.2d 403, 405 (Ct. App. 1987). See also, McQillan *on Municipal*

*Corporations* (3d Ed.), Vol. 8 §25.180.  ("A nonconforming use is one which lawfully existed prior to the effective date of a zoning restriction and which is allowed to continue in nonconformity with the restriction.")

Land use qualifies as nonconforming if there is an "active and actual use" of the property that existed prior to the passage of the new zoning regulation. *Waukesha County v. Seitz*, 140 Wis. 2d 111, 409 N.W.2d at 405. Here, but for the use of unconstitutional restraints, there would have been active and actual nude dance entertainment. The plaintiffs therefore request that the Court use its equitable power to order that the plaintiffs be placed in the position that they would have been in had no unconstitutional restrictions prevented them from offering nude dance last spring as they intended.  This would mandate that they be allowed to present nude dance entertainment at their location at 861 Grand Avenue as a nonconforming use.  It would also require that the building permit, which was denied to them only because they are deemed to be an indoor theater operating without a conditional use permit (PPFOF # 50), be granted.

## VII.   THE   SCHOFIELD   ADULT   ENTERTAINMENT   ORDINANCE, §16.03 (2) IS FACIALLY INVALID.

### A.  The Ordinance is Unconstitutionally Overbroad.

The Schofield adult entertainment ordinance, §16.03 (2), applies to all "establishments dealing in alcoholic beverages." § 16.03 (5).  Private residences are excluded. §16.03 (5). In such establishments, no person

may expose to public view his or her genitals, pubic area, vulva, anus, anal cleft or buttocks or any simulation thereof. § 16.03 (6) (a).  No female may expose any portion of her breast below the top of the areola or any simulation thereof. § 16.03 (6) (b).  No one operating such an establishment may permit any person to expose such parts. § 16.03 (6) (c) and (d).

No person operating such establishment may permit any "sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, any sexual act prohibited by law, touching, caressing, fondling of the breast, buttocks, anus or genitals or the simulation thereof." § 16.03 (6) (e).  No one operating such establishment may permit "the graphic representation, including pictures or the projection of film which depict any of the prohibited body parts or moves or the simulation thereof." § 16.03 (6) (f).  Penalties include revocation of liquor licenses as well as forfeitures of $100 to $300 per day.  § 16.03 (7) (a) and (b).  There is no severability clause.

As noted previously, in the context of an ordinance regulating expressive nudity, an overbreadth analysis starts with the proposition that the government may prohibit or regulate expressive activity which can be plausibly believed to cause adverse secondary effects, but where expressive activity cannot plausibly be believed to cause such secondary effect, the government may not regulate.  *Schultz,* 228 F.3d at 849. The ordinance is overbroad in several respects because its prohibitions are

32

drafted so broadly as to ban expressive activity that could not plausibly be believed to cause secondary effects.

### 1. prohibitions not limited to live performances

First, the specification of activities which are prohibited is too broad. The prohibitions are not limited to nude dancing or even to live performances, but also include "graphic representations," specifically including pictures or films which depict any of the prohibited body parts. § 16.03 (6) (f). There is no exemption in the ordinance for serious artistic works that contain nudity.  This means that an art exhibit that included the famous classical nude statue of David would be prohibited anywhere licensed to serve alcohol, as might any number of nude paintings.

The broad language in the Ordinance also would ban a live performance of a work with unquestioned artistic or social merit, be it a ballet performance such as *L'apres midi d' un faune*, which is traditionally performed in the nude, a television program such as *N.Y.P.D. Blue*, which often has brief glimpses of nudity, or a serious drama such as *Equus*, none of which could plausibly be believed to cause adverse secondary effects.  A movie that contains nudity but no eroticism, such as *Schindler' s List*, which shows the emaciated nude bodies of concentration camp victims, would even trigger the ordinance's regulations.

33

There is no exemption for non-erotic demonstrations that involve partial nudity, such as demonstrations for all-female audiences on how to conduct a self-examination for breast cancer, or perhaps at a meeting of La Leche League, how to breast-feed correctly. As a result of these flaws, the ordinance runs afoul of the overbreadth doctrine: "[T]his definition would include a theater or playhouse that shows on a regular basis an interpretation of *Hair*, a presentation characterized by much nudity but which the Court has indicated constitutes protected speech.... The ordinance contains no explicit exception for expression that contains nudity or sexual depiction but also possesses serious artistic, social or political value." *Schultz,* 228 F.3d at 849-50.

## 2. prohibitions cover too many places

The specification of areas where listed activities are banned is also overbroad.  Since "establishments dealing in alcoholic beverages," are defined to include any business licensed by the state for sale and/or service of alcoholic beverages including any "bottle club, hotel, motel, restaurant, night club, country club, cabaret, meeting facility utilized by any religious, social, fraternal or similar organization, ..."  or any business  where the consumption of alcohol is permitted,   § 16.03 (5), the reach of the ordinance extends beyond bars and taverns to encompass other establishments which hold liquor licenses, such as hotels and restaurants.  Further, the ordinance does not simply ban the

expression only in the very room where liquor is being served, but anywhere on the premises.  Therefore, the ban extends not just to a hotel's bar, but to its lobby, conference centers, and meeting rooms. When the sweep of the geographic application of the ordinance is considered, the ordinance's prohibition on non-erotic artistic performances and educational demonstrations involving partial nudity discussed above begins to seem more dangerously overbroad; hotel and restaurant meeting rooms and performance spaces are common venues for such events.

### 3.  prohibits isolated instances

The ordinance is overbroad in another respect.  Even if it were aimed only at nude dancing, or only nude dancing in barrooms, the ordinance makes no exception for performances which occur only occasionally.  For example, it is not uncommon for a tavern in Wisconsin to try to present some special entertainment for its female patrons during deer-hunting season, when many wives find themselves to be temporary "deer-hunting widows."  If a tavern or hotel were to bring in the Chippendales, a male striptease ensemble, once a year for such an occasion, it is unlikely in the extreme that there would be an outbreak of prostitution or a plunge in neighboring property values as a result.

Another scenario which is not uncommon in Wisconsin is the renting of a private party room at a hotel or restaurant for a bachelor or bachelorette party, complete with stripper. In some venues this might

occur quite rarely, say, once or twice a year.  Certainly, no studies support the idea that occasional or isolated performances, even of an unapologetically erotic nature, could have such secondary effects. Therefore, any ordinance which is drafted narrowly to attack only secondary effects must be drafted in such a way as to regulate only nude dancing which is offered on some sort of regular basis, because only in such a circumstance might such entertainment plausibly be thought to cause adverse secondary effects.  The ordinance does not exempt such an infrequent occurrences from its prohibition, and this failure is one more way in which it sweeps with too a broad a brush.

### 4. cannot be saved by a limiting construction.

First Amendment jurisprudence requires that if a court finds an ordinance is drafted too broadly, it has a duty to "save" the ordinance by applying a limiting construction if such a construction is readily available. *Schultz*, 228 F.3d at 850. As it is apparent from the language of the ordinance that the Schofield legislators sought to encompass as many activities as possible within their prohibition and to exempt none, there is no simple, obvious limitation which this Court can impose and remain true to the legislative intent, as would be required.

The Court cannot rewrite the ordinance in a manner which would render it constitutional without abandoning its judicial role and assuming a legislative role.  The Court cannot insert the necessary

36

language which would limit the prohibition of the ordinance to nude dancing which is carried on with some type of regularity, because it is for the city itself to determine with what regularity nude dancing must occur before it is likely to be realistically associated with secondary effects.

The Seventh Circuit, addressing this issue, has cautioned:

> We are well aware of the rule requiring courts to construe statutes consistently with the Constitution, if the language will bear any such construction.  But the qualification that the language must be able to bear such a construction is an important one.  Courts cannot redraft statutes so that they read the way [the legislature] might have written them, or should have written them.  Instead, we must take the laws as they are given to us and work with them.

*French v. Duckworth*, 178 F.3d 437, 442 (7th Cir. 1999).

The language of the ordinance will simply not bear the narrowing construction which it must have in order to be rendered constitutional, which would have the Court construe the ordinance to prohibit only live, nude, erotic dancing in bars and taverns.

### B. The Adult Entertainment Ordinance Was Repealed by the New Adult Oriented Establishment Provisions.

The new zoning code provision, at § 10.15(6)(g)-3, provides that all ordinances or parts thereof that conflict with it are repealed.  The Adult Entertainment Ordinance, § 16.03, prohibits all nude and some semi-nude entertainment at establishments licensed to serve alcohol.  This conflicts with the provisions of Adult-Oriented Establishment provision of the zoning code, §10.15(6)(g), because *that* law *does* allow nude and

37

semi-nude dance in taverns at I-1 and I-2 zoning districts. Therein, an adult cabaret is defined as "**nightclub, bar, restaurant** or similar commercial establishment **which regularly features** (i) **persons who appear in a state of nudity** or semi-nudity, (ii) live performances which are characterized by the exposure of specified anatomical areas or specified sexual activities, or (iii) films, motion pictures, video cassettes, slides or other photographic reproductions which are characterized by the depiction or description of specified sexual activities or specified anatomical areas. §10.15(6)(g)-2-C (emphases added).

The creation of §10.15(6)(g) in July, 2003, therefore, effected the repeal of § 16.03. Confronted with this concept when it received the plaintiffs' complaint, the city passed in December, 2003, amendments to the Adult Entertainment Ordinance, saying that it had conducted further study of the off-site, secondary effects of adult-oriented businesses, that those studies document the negative secondary effects of adult-oriented businesses serving alcohol, and that the city finds that the negative effects of adult-oriented businesses are exacerbated by the service and consumption of alcohol at such businesses. § 16.03 (3a).  The amendment also says that any conflicts between §16.03 and other ordinances should be harmonized, and it is not, nor has it ever been the intention of the City to repeal §16.03, the Adult Entertainment Ordinance. § 16.03 (8).  This effort to void the repeal by subsequent amendment is legally ineffective.

38

The amendment is simply an attempt to interpret previously enacted legislation.  It is a well-accepted canon of statutory construction that a legislature by a later enactment cannot establish or affect the construction of a former act so as to have it operate retroactively.  *State ex rel Thompson v. Nash*, 27 Wis. 2d 183, 190, 133 N.W. 2d 769 (1965); *State ex rel Larson v. Giessel*, 266 Wis. 547, 555, 64 N.W.2d 421 (1954). See also *Yanta v. Montgomery Ward & Co., Inc.,* 66 Wis. 2d 53, 69, 224 N.W. 2d 389, 398 (1974)(J. Hansen dissenting)(" The Wisconsin rule on this point has been well stated to be: '...[T]he legislature by a later enactment cannot establish or affect the construction of a former act so as to have it operate retroactively...,'"); *Green Bay Drop Forge Co. v. Wojcik*, 265 Wis. 38, 61 N.W. 2d 847, 848 (1953) and  *Northern Trust Co. v. Snyder*, 113 Wis. 516, 530, 89 N.W. 460, 464 (1902) ("It is too elementary to justify us in referring to authority on the question, that a legislative body is not permitted under any circumstances to declare what its intention was on a former occasion so as to affect past transactions.")

Despite the city's request that conflicts with other ordinances be harmonized, there really is no way to harmonize §16.03 with §10.15(6)(g), without ignoring the plain language of one or the other.  The zoning code provision requires that any ordinance or portion thereof that conflict with it are repealed.  The conflict between §10.15(5)(g)(3), which allows adult cabarets that both serve alcohol and present nude dance to exist and

regulates such establishments by locating them in the industrial districts, and §16.03, which does not allow adult cabarets to that serve alcohol and present nude dance to exist at all, is unavoidable. Once that conflict comes into existence, repeal of §16.03 is automatic, and the Adult Entertainment Ordinance cannot be resurrected by a posthumous interpretation that ignores the plain language of §10.15(5)(g)(3).

## VIII.  THE NEW ZONING CODE ADULT ORIENTED ESTABLISHMENT PROVISIONS DO NOT MEET THE GUIDELINES FOR A TIME, PLACE, AND MANNER REGULATION OF EXPRESSION.

On July 24, 2003, the City Council amended the zoning code by enacting § 10.15 (6)(b)(36) and §10.15(6)(g), Adult-Oriented Establishments,  which took effect upon its publication on July 29, 2003. This new zoning provision defines Adult-Oriented Establishments as adult bookstores, novelty stores, video stores, motion picture theaters and cabarets. §10.15(6)(g)-2.  It also includes "any premises to which public patrons or members of a private organization are invited or admitted and which are physically arranged so as to provide booths, cubicles, rooms, compartments or stalls separate from the common areas of the premises for the purpose of viewing adult entertainment or wherein an entertainer provides adult entertainment to a member of the public, a patron or a member of a private organization, whether or not such adult entertainment is held conducted or operated for profit, direct or indirect." §10.15(6)(g)-2.  There is no exception for private residences.

An adult cabaret is defined as "nightclub, bar, restaurant or similar commercial establishment which regularly features (i) persons who appear in a state of nudity or semi-nudity, (ii) live performances which are characterized by the exposure of specified anatomical areas or specified sexual activities, or (iii) films, motion pictures, video cassettes, slides or other photographic reproductions which are characterized by the depiction or description of specified sexual activities or specified anatomical areas. §10.15(6)(g)-2-C.

"Adult entertainment" means "any exhibition of motion pictures, live performance, display or dance of any type, which has as its dominant theme, or is distinguished by or characterized by an emphasis on, any actual or simulated specified sexual activities or specified anatomical areas …, or the removal of articles of clothing to appear totally nude or to displace a nude genital area or female nude breast or breasts." §10.15(6)(g)-2-D.

"Specified sexual activities" means "simulated or actual (i) showing of the human genitals in a state or sexual stimulation or arousal; or (ii) acts of masturbation, sexual intercourse, sodomy, bestiality, necrophilia, sadomasochistic abuse, fellatio, cunnilingus; or (iii) fondling or erotic touching of human genitals, pubic region, buttocks or female breasts." §10.15(6)(g)-2-E.  "Specified anatomical areas" means "(i) human genitals, pubic region, buttocks, anus, or the areola of a female breast or breasts less than completely and opaquely covered by clothing; or (ii)

human male genitals in a discernibly turgid state, even if opaquely covered by clothing." §10.15(6)(g)-2-F.

An Adult-Oriented Establishment is a permitted use in the I-1 and I-2 (Industrial) Districts. §10.15(6)(b)-36. A customer entrance to an Adult-Oriented Establishment shall not be located within 500 feet of a residence zoning district boundary located within the City of Schofield or within 500 feet of the city limits or within 1000 feet of any customer entrance to any existing Adult-Oriented Establishment. §10.15(6)(g)- 2-G (i), (ii).

### A. The New Provision is Unconstitutional Under *Alameda Books* Standards Because it Impermissibly Reduces the Opportunities for Adult Expression.

The Supreme Court has recently clarified that regulation of sexually explicit expression believed to cause adverse secondary effects may not be accomplished by reducing the opportunity for expression, but must be confined to reducing the secondary effects. In *City of Los Angeles v. Alameda Books*, 535 U.S. 425 (2002), the Court produced a plurality opinion that examined what a city can and cannot do in its efforts to reduce secondary effects. In *Ben's Bar v. Village of Somerset*, 316 F. 3d 702, 722 (7th Cir. 2003), the Seventh Circuit applied the rule of *Marks v. United States*, 430 U.S. 188, 193 (1977) and held that "because Justice Kennedy's concurrence is the narrowest opinion joining the

judgment of the Court in *Alameda Books*, we conclude that it is the controlling opinion."

In that concurrence, Justice Kennedy concluded:

> In *[C]ity of Renton [v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)]*, the Court determined that while the material inside adult bookstores and movie theaters is speech, the consequent sordidness outside is not. The challenge is to correct the latter while leaving the former, as far as is possible, untouched. If a city can decrease the crime and blight associated with certain speech by the traditional exercise of its zoning power, and at the same time leave the quantity and accessibility of speech substantially undiminished, there is no First Amendment objection.

*Id.* at 445.

Justice Kennedy clarified his approach by explaining:

> It is no trick to reduce secondary effects by reducing speech or its audience, but a city may not attack secondary effects indirectly by attacking speech....It is true that cutting adult speech in half would probably reduce secondary effects proportionately. But again, a promised proportional reduction does not suffice. Content-based taxes could achieve that, yet these are impermissible.

*Id.* at 450-51.

Despite this guidance, reducing secondary effects by reducing the opportunity for adult speech seems to be exactly what Schofield legislators did. Prior to the passage of §10.15(5)(g)(3), there were no separate zoning regulations for adult entertainment; adult entertainment was regulated like all other entertainment – it was treated for zoning

purposes as "similar to" an indoor theater and was allowed in zoning area C-1 as a conditional use and in areas C-2, I-1, and I-2 as a permitted use. (PPFOF #'s 22, 23, 25, 26, 27, 40). The passage of the new zoning code, which allows adult entertainment only in areas zoned I-1 and I-2, has reduced the area within the City of Schofield where adult entertainment is allowed. (PPFOF 41).  Zoning Administrator King testified that the passage of the new adult entertainment zoning ordinance eliminated "dozens of sites" for adult businesses in the C-2 district where indoor theatres -- the former classification used for adult businesses -- are permitted uses, and dozens more in the C-1 district where indoor theatres are conditional uses.  King Dep. at 41.

### B. The New Provision is Overbroad.

The new Adult-Oriented Establishment provision is overbroad in many of the same ways already discussed in previous sections.  Chief among its flaws is the lack of any exemption for serious works of art.  By its terms, the provision would require every store selling art history books, every museum, anything that displayed nudity, to move the industrial section of the city, even though no adverse secondary effects can plausibly be believed to flow from them.

It is also overbroad in that it makes no exception, as §16.03 does, for private residences.  Its language specifically applies to premises where members of a private organization are admitted if adult

entertainment (which includes movies, dancing, or removal of clothing) is provided to members of the organization, even for no charge.

§ 10.15(6)(g) 2. Therefore, its terms encompass a stag party in a private home, a private screening of a movie that contains nudity, or a party at an office where a stripper has been hired to offer birthday congratulations. Of course, none of these is likely to produce adverse secondary effects. Further, the definition of adult oriented establishment that applies to private organizations is not limited as to frequency of occurrences. Therefore, even a single episode of displaying a movie with nudity would qualify a private residence, office or club as an adult oriented establishment, doomed to exist only in the industrial section.

While the definition of an adult cabaret is somewhat limited by the term "regularly," the term "regularly" is not defined anywhere within the ordinance and therefore offers no real limitation. Both defects (lack of exemption for serious works of art and lack of definition of "regularly") have been addressed by the Seventh Circuit:

> The ...definitions for adult theater and adult cabaret cover a commercial establishment that regularly features persons who appear in a state of nudity of semi-nude. This definition lends itself to an expansive interpretation. Regularly means in a regular orderly lawful or methodical way and regular means returning, recurring or received at stated fixed or uniform intervals.... The definition for adult theater and adult cabaret might include ... any venue that presents at orderly intervals, as a matter of normal course, performances that prominently include nudity or semi-nudity. So construed, this definition would include a theater or playhouse

> that shows on a regular basis an interpretation of
> *Hair*.....The text does not limit its regulation to
> adult entertainment because an array of
> regularly featured artistic and theatrical
> expression includes live nudity or semi-nudity
> without necessarily becoming content readily
> analogous to the adult entertainment regulated
> in *Renton* and *Young*.  Unlike statutes upheld
> against overbreadth challenges in other cases,
> the Ordinance contains no explicit exception for
> expression that contains nudity or sexual
> depiction but also possesses serious artistic
> social or political value.

*Schultz*, 228 F. 3d at 849-50 (internal quotations and citations omitted).

Like the ordinance examined in *Schultz,* the Adult Oriented

Establishment provision sweeps too broadly and regulates expression

that has no relation to secondary effects.

### C. The New Provision is not Narrowly Tailored.

As the zoning provision regulates the place and manner of

expression, it must comport with the well-know requirements that it

must (1) serve a legitimate government interest, (2) be narrowly tailored

to serve that interest, and (3) allow ample alternative avenues of

expression.  *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 49-50

(1986).  Part of the definition of an adult cabaret, i.e., a "nightclub...

which regularly features...(ii) live performances which are characterized

by... specified sexual activities....", §10.15(6)(g)2C,  mirrors the language

in *Schultz* that was found to intrude too far on a dancer's right to express

an erotic message through her dance movements.  Since specified sexual

activities includes the "fondling or erotic touching of human genitals,

46

pubic region, buttocks or female breasts, " a dancer, even one fully

dressed so as to avoid regulation as an Adult-Oriented Establishment, is

prohibited from touching herself during her dance unless the dance hall

owner is willing to be consigned to the gulag of the industrial district as a

result.

> In *Schultz*, the Seventh Circuit addressed this very issue and ruled:
>
> > [A portion of the challenged ordinance] outlaws the performance of a strikingly wide array of sexually explicit dance movements, or what the Ordinance misdenominates as 'specified sexual activities,' including ' the fondling or erotic touching of human genitals, pubic region, buttocks, anus, of female breasts.' By restricting the particular movements and gestures of the erotic dancer,... the Ordinance unconstitutionally burdens protected expression. The dominant theme of nude dance is an emotional one; it is one of eroticism and sensuality. [The ordinance] deprives the performer of a repertoire of expressive elements with which to craft an erotic sensual performance and thereby interferes substantially with a dancer's ability to communicate her erotic message.
> > *****
> > Unlike a simple prohibition on full nudity, [the ordinance] does much more than inhibit that portion of the expression that occurs when the last stitch is dropped. [It] constrains the precise movements that the dancer can express while performing. The dancer may use non-sexually explicit elements and semi-nudity to covey a certain degree of sensuality, but putting taste aside, more explicit and erotic content is commonly available on primetime television without being regarded as adult entertainment.

*Schultz*, 228 F.3d at 847 (internal quotations and citations omitted). By

placing such a burden on the erotic message of the dancer, the provision

fails the narrow tailoring test.

**CONCLUSION**

The Court should hold that the City's now-repealed public entertainment licensing ordinance, § 11.22, was unconstitutional, and that the Plaintiffs are entitled to recover damages for their injuries sustained during the existence of this ordinance.

The Court should hold that the City's Indoor Theatre zoning scheme in the C-1 zoning district is unconstitutional because it identifies a land use by reference to the exercise of protected rights of free expression and then makes it subject to a permitting scheme that creates the opportunity for covert censorship through vague and subjective standards for granting and denying permits and through the potential for indefinite delay in a permitting decision.  The Court should enjoin the City from enforcing its Indoor Theatre zoning scheme against the Plaintiffs in the C-1 zoning district and hold that the Plaintiffs are entitled to recover damages for their injuries sustained as a result of this scheme.

The Court should hold that the City's adult entertainment ordinance, § 16.03, was, and, if it was not repealed, remains, void for overbreadth.  The Court should hold that the ordinance was repealed, but, if it does not, the Court should enjoin its enforcement.  The Court should hold that the plaintiffs are entitled to damages for their injuries sustained by virtue of the effect of this ordinance upon them.

The Court should hold that it need not reach the question of the constitutionality of the City's new adult entertainment zoning ordinance, § 10.15 (6)(b)(36) and §10.15(6)(g), because but for the effect upon the Plaintiffs of the foregoing unlawful ordinances, the Plaintiffs would have been lawfully operating a burlesque club with liquor sales offering nude and semi-nude dance at the time the new zoning ordinance was passed, and, as a nonconforming use, would have been unaffected by the new zoning ordinance, and based on this holding the Court should enjoin the City from enforcing the new zoning ordinance against the Plaintiffs.  If the Court should reach the issue of the constitutionality of the new zoning ordinance, it should hold that it is unconstitutional, enjoin its enforcement against the Plaintiffs, and hold that the Plaintiffs are entitled to any damages sustained by virtue of its effects on them.


Dated this 30th day of July, 2004


Respectfully submitted,

EDWARD G. KRAIMER, Jr.,
GERALD J. MORRELL,
GRAND DADDY'S LLC, and
KRAIMER PROPERTIES, LLC,
Plaintiffs

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar No. 1016284

131 W. Wilson St., Suite 1200
Madison, WI 53703
Phone:        (608) 283-6001
Facsimile:    (608) 283-0945
E-mail:       jsolson@scofflaw.com

Jeff Scott Olson
ATTORNEYS FOR PLAINTIFF