Document Number Case Number
39        03-C-0473-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
08/19/2004 08:00:07 PM CDT

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

EDWARD G. KRAIMER, JR.
GERALD J. MORRELL,
GRAND DADDY'S, LLC, and
KRAIMER PROPERTIES, LLC,

                              Plaintiffs,

v.                                        Case No.: 03 C 0473 C

CITY OF SCHOFIELD,

                              Defendant.

## DEFENDANT'S RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT

The defendant, City of Schofield, by its attorneys, submits the following response to the Plaintiffs' proposed findings of fact in support of their motion for summary judgment:

### CHRONOLOGY OF EVENTS

1.      *Since 1998, the plaintiff Ed Kraimer, has held an ownership interest in the building and property at 861 Grand Avenue (hereinafter "the property"), in the City of Schofield, Marathon County, Wisconsin. (Deposition of Plaintiff Edward G. Kraimer, (hereinafter, "Kraimer Dep"), at 15-16).*

RESPONSE: Partially Disputed. Ed Kraimer through various corporate entities has had a partial interest in the property since 1998, first as part of a land contract

1

arrangement with Tim Schertz; later in late 2002 or early 2003, the plaintiff, Kraimer Properties, LLC, bought out Mr. Schertz, and Kraimer Properties, LLC, now has a land contract for the property with Randy Erbach. (Edward Kraimer Deposition, p. 15-16, 26).

2.     *The property is zoned C-1, First Commercial District. (Deposition of Schofield City Attorney Philip Freeburg (hereinafter "Freeburg Dep") at 8, 10).*

RESPONSE: Undisputed.

3.     *Grand Avenue is in the heart of the commercial district in Schofield and is one of the primary arteries for Wausau metropolitan vehicular traffic. (Kraimer Dep at 21 – 22).*

RESPONSE: Undisputed.

4.     *Many bars and restaurants are located on Grand Avenue. (Kraimer Dep at 22).*

RESPONSE: Undisputed, however, there are other types of retail businesses and also residences on Grand Avenue located near 861 Grand Avenue.  (Edward Kraimer Deposition, p. 22-24).

5.     *Ed Kraimer purchased the property in 1998 with a partner, Tim Schertz. (Kraimer Dep at 15).*

RESPONSE: Undisputed.

2

6.      *From 1998 until 2002, Kraimer ran the property as a liquor licensed nightclub called the Grand Central Dance Club. (Kraimer Dep at 16, 19).*

RESPONSE: Undisputed.

7.      *When Kraimer operated the Grand Central Dance Club, it operated as a dance club on both weekends and weeknights, offering the opportunity for customer dancing with music provided by a live disk jockey. (Kraimer Dep at 19).*

RESPONSE: Partially Disputed.  While Grand Central Dance Club was operated part of the time as a dance club and night club, the business also served pizza to its customers, and provided music through a DJ, but did not provide live music through regularly scheduled bands.  (Edward Kraimer Deposition, p. 18-19).

8.      *Plaintiff Kraimer Properties, LLC is a limited liability corporation formed in 2001 by the plaintiff Ed Kraimer and his wife Kim Kraimer.  (Kraimer Dep at 7 – 9).*

RESPONSE: Partially Disputed.   Kraimer Properties is a limited liability corporation owned equally by Edward Kraimer and Kim Kraimer.  (Edward Kraimer Deposition, p. 8-10).

9.      *In 2002, Kraimer Properties, LLC bought out Tim Schertz's half interest in the property to assume full ownership of the property. (Kraimer Dep at 17).*

RESPONSE: Partially Disputed.  In late 2002 or early 2003, the plaintiff, Kraimer Properties, LLC, bought out Mr. Schertz, and Kraimer Properties, LLC, now has a land

3

contract for the property with Randy Erbach. (Edward Kraimer Deposition, p. 15-16, 26).

10.    *The Grand Central Dance Club ceased operation due to financial difficulties in late 2002 or early 2003.  (Kraimer Dep at 25 – 26).*

RESPONSE: Undisputed.

11.    *Sometime in 2003, plaintiff Gerald Morrell and his wife Nikki approached Ed and Kim Kraimer with a proposal about the property. (Kraimer Dep at 28).*

RESPONSE: Partially disputed. According to Gerald Morrell, he and his wife approached just Edward Kraimer in May 2003 about opening a nonalcoholic, adult business providing nude or semi nude dancing at the Grand Central location, which had closed operations by that time.   (Gerald Morrell Deposition, p. 16, 20, 21).

12.    *The Morrells proposed reopening the tavern as an upscale, non-alcoholic, gentleman's club offering adult dance entertainment.  (Kraimer Dep at 29-30, Deposition of Gerald J. Morrell, (hereinafter "Morrell Dep") at 28-29).*

RESPONSE:  Partially disputed.  Gerald Morrell testified: (1) that from the very beginning he and his wife only wanted to operate their proposed business not as a "tavern" but as a non-alcoholic adult business featuring nude or semi-nude dancing (Gerald Morrell Deposition, p. 20-21); (2) that "alcohol wasn't going to be part of [their] income generating structure (Gerald Morrell Deposition, p. 21);" (3) that Edward Kraimer was aware of this from the early stages of the planning (Gerald Morrell Deposition, p. 21); (4)

4

and that Gerald Morrell was the one most familiar with the day-to-day operation of the business.  (Gerald Morrell Deposition, p. 12).

13.     *The plaintiffs' reasoning behind the original plan to operate as a non-alcohol serving adult dance establishment was twofold: there was a Schofield ordinance that prohibited adult entertainment at any establishment where alcohol was served, and there were so few places for the under-21-year-old customers (who are denied entrance to places that serve alcohol) to go. (Kraimer Dep at 34-35,  Morrell Dep at 21-22).*

RESPONSE: Partially disputed.  Morrell testified: (1) that the Schofield Ordinance prohibiting alcohol in adult businesses did not have any impact on their business plan because they never intended to serve alcohol at the business (Gerald Morrell Deposition, p. 22); (2) that from the very beginning he and his wife only wanted to operate their proposed business as a *non*-alcoholic adult business featuring nude or semi-nude dancing (Gerald Morrell Deposition, p. 20-21); (3) that "alcohol wasn't going to be part of [their] income generating structure (Gerald Morrell Deposition, p. 21);" (4) that Edward Kraimer was aware of this from the early stages of the planning (Gerald Morrell Deposition, p. 21).

14.     *Although Kraimer would have preferred to both serve alcohol and present nude dance entertainment, he realized that there was no point in discussing the relative merits of that as an alternative in April 2003, since at that time the adult entertainment ordinance did not allow both nudity and alcohol, and of the two options, he and*

*Morrell both agreed that nude dance was the most important to start with. (Declaration*

*of Edward G. Kraimer, Jr. in Support of Plaintiffs' Motion for Summary Judgment,*

*hereinafter "Kraimer Declaration" at ¶7).*

RESPONSE: Disputed.  Kraimer was a silent partner of the business and not the

day-to-day manager of the business, and he testified that he was not "going to have

anything to do with the day-to-day operations" of the business and that Gerald Morrell

would be the only one testifying about how the business would be run.  (Edward Kraimer

Deposition, p. 36-37).   Gerald Morrell testified (1) that the Schofield Ordinance

prohibiting alcohol in adult businesses did not have any impact on their business plan

because they never intended to serve alcohol at the business (Gerald Morrell Deposition, p.

22); (2) that from the very beginning he and his wife only wanted to operate their proposed

business as a *non*-alcoholic adult business featuring nude or semi-nude dancing (Gerald

Morrell Deposition, p. 20-21); (3) that "alcohol wasn't going to be part of [their] income

generating structure (Gerald Morrell Deposition, p. 21);" and (4) that Edward Kraimer was

aware of this from the early stages of the planning (Gerald Morrell Deposition, p. 21).

15.   *Kraimer and Morrell thought of the non-alcoholic venue for presenting*

*nude dance as a "starting point." (Kraimer Declaration" at ¶7).*

RESPONSE: Disputed.  Kraimer was a silent partner of the business and not the

day-to-day manager of the business, and he testified that he was not "going to have

6

anything to do with the day-to-day operations" of the business and that Gerald Morrell would be the only one testifying about how the business would be run. (Edward Kraimer Deposition, p. 36-37). Gerald Morrell testified (1) that the Schofield Ordinance prohibiting alcohol in adult businesses did not have any impact on their business plan because they never intended to serve alcohol at the business (Gerald Morrell Deposition, p. 22); (2) that from the very beginning he and his wife only wanted to operate their proposed business as a *non*-alcoholic adult business featuring nude or semi-nude dancing (Gerald Morrell Deposition, p. 20-21); (3) that "alcohol wasn't going to be part of [their] income generating structure (Gerald Morrell Deposition, p. 21);" and (4) that Edward Kraimer was aware of this from the early stages of the planning (Gerald Morrell Deposition, p. 21).

16. *Plaintiffs Gerald Morrell and Ed Kraimer formed Grand Daddy's, LLC as a limited liability corporation to operate the tavern at 861 Grand Avenue. (Kraimer Dep at 14, 45, 46; Morrell Dep at 5).*

RESPONSE: Partially disputed. The corporation was formed by the Morrells and Kraimers to run a business at 861 Grand Avenue, but there is no testimony that the business was going to be a tavern, to the contrary, Gerald Morrell testified that the business was not going to serve alcohol. (Edward Kraimer Deposition p. 14, 45, 46; Gerald Morrell Deposition, p. 5, 21-22).

17. *Grand Daddy's, LLC leases the premises from Kraimer Properties, LLC.*

*(Kraimer Dep at 46-47).*

RESPONSE:  Undisputed.

18.    *The plan was for Morrell to manage the business.  (Kraimer Dep at 14; 36).*

RESPONSE: Undisputed but supplemented, Edward Kraimer testified that he was not the day-to-day manager of the business, and further that he was not "going to have anything to do with the day-to-day operations" of the business and that Gerald Morrell would be the only one testifying about how the business would be run.  (Edward Kraimer Deposition, p. 36-37).

19.    *The Morrells invested over $25,000 in the business as start-up capital. (Morrell Dep at 6).*

RESPONSE:  Partially disputed.   Gerald Morrell testified that he and his wife invested "a little over [$]25,000."  (Gerald Morrell Deposition, p. 6).

20.    *On April 28, 2003, plaintiffs Kraimer and Morrell filed an application for a Public Entertainment/Exhibition License as a Nonliquor Licensed Establishment, pursuant to Schofield Ordinance § 11.22, with the City Clerk, Tracy Narlock. (Complaint, ¶ 403; admitted in Defendant's Answer, ¶ 8; Morrell Dep at 32-33, 38).*

RESPONSE: Disputed only to the extent that the Ordinance in question is actually properly identified as Schofield Ordinance § 11.20. (Tracey Hoff Affidavit, p. 4, ¶ 4(a),

Exhibit SJ-8).

21. *After the City of Schofield received the plaintiffs' application for a public*
*entertainment license, it contacted the City Attorney, Philip Freeburg. (Freeburg Dep at*
*5, 6; Defendant's Response to Plaintiffs' Interrogatories, attached to Freeburg Dep as*
*Exhibit 16 (hereinafter "Response"), Answer 1 and Response Exhibit A).*

RESPONSE:  Partially disputed.  City of Schofield Mayor James Krause forwarded
the application to the City Attorney, Philip Freeburg, for his review.  (Philip Freeburg
Deposition, p. 7-8).

22. *At that time, (in April, May, and June of 2003), adult entertainment was*
*not listed by the City of Schofield's zoning code as a permitted use anywhere within the*
*city. (Morrell Dep at 35; Freeburg Dep at 47).*

RESPONSE: Partially disputed.  The zoning code was silent regarding a type of
business for which its principal use was dedicated to adult entertainment, meaning the
zoning code made no distinction between a business with a principal use dedicated to *adult*
public entertainment and exhibition and a business with a principal use dedicated  to *non-*
*adult* entertainment and exhibition.  (Freeburg Depo., June 30, 2004, p. 7-10; Hoff
Affidavit, p. 5, p. 5, ¶ 5(c) & Exhibit SJ-17).

Thus, on May 6, 2004, City Attorney Freeburg sent the mayor an opinion letter
discussing the plaintiffs' application and, among other things, his opinion that under the

City's zoning code, the plaintiffs' proposed non-alcoholic adult business, with a self-professed principal use of featuring nude or semi-nude dancing entertainment, would require a conditional use permit to operate in the C-1 District. (Freeburg Depo., June 30, 2004, p. 7-9; Hoff Affidavit, p. 5, p. 5, ¶ 5(c) & Exhibit SJ-17).   Freeburg concluded in his May 6 letter the following:

> I do have some observations that are implicated by the zoning code.  Under zoning regulations, if a particular use is not specifically permitted, it is to be understood to be prohibited.  Reviewing the list of permitted uses in a C-1 commercial district, the public exhibition or public entertainment is not a permitted use.  Those C-1 premises where public exhibition and entertainment has been as an ancillary or incidental use of a tavern, which is a permitted use.
>
> There is no specific conditional use which addresses an establishment primarily dedicated to public exhibition or entertainment.  However, a "indoor theater" is a conditional use in a commercial district.  A conditional use, as you know, is one that is not permitted as a right, but under the proper circumstances and with the imposition of the appropriate conditions, may be granted as a conditional use in that particular zoning district.  The common dictionary definition of a theater is a building for dramatic performances or a building or area for showing motion pictures.  This does not strictly apply to the proposed activity of this public entertainment/exhibition license.  However, section 16.15(4)(c) indicates a conditional use permit can be issued for "other uses similar to or customarily incident to any of the above uses."  Therefore if this activity is going to be conducted, it would be necessary for the owner of the property to first obtain a conditional use permit.
>
> ....

> In summary, based on the information available to date, it appears that an exhibition/entertainment license cannot issue pursuant to this application because at present the applicant cannot comply with section 2(dd)(3) regarding compliance with other applicable rules, regulations, ordinances and state laws. It appears that unless the applicants surrender the alcohol licenses for the premises and obtain a conditional use permit for the proposed use, the public entertainment/exhibition license cannot issue.

(Freeburg Depo., June 30, 2004, p. 7-10; Hoff Affidavit, p. 5, p. 5, ¶ 5(c) & Exhibit SJ-17). However, a business with a subordinate or incidental use of public entertainment and exhibition could be either a permitted or conditional use under the zoning code depending on the zoning district classification. (Freeburg Depo., June 30, 2004, p. 7-10; Hoff Affidavit, p. 5, p. 5, ¶ 5(c) & Exhibit SJ-17).

23.   *Nor was adult entertainment listed anywhere in the zoning code as a potential conditional use in any zoning district in the city. (Freeburg Dep at 47).*

RESPONSE: Partially disputed.  The zoning code was silent regarding a type of business for which its principal use was dedicated to adult entertainment, meaning the zoning code made no distinction between a business with a principal use dedicated to *adult* public entertainment and exhibition and a business with a principal use dedicated to *non-adult* entertainment and exhibition.  (Freeburg Depo., June 30, 2004, p. 7-10; Hoff Affidavit, p. 5, p. 5, ¶ 5(c) & Exhibit SJ-17).  However, a business with a subordinate or incidental use of public entertainment and exhibition could be either a permitted or

conditional use under the zoning code depending on the zoning district classification. (Freeburg Depo., June 30, 2004, p. 7-10; Hoff Affidavit, p. 5, p. 5, ¶ 5(c) & Exhibit SJ-17).

24.     *Taverns were listed as a permitted use in C-1 zoning district in the zoning code. (Deposition of City Zoning Administrator Kevin James King (hereinafter King Dep) at 16).*

RESPONSE:  Partially undisputed.   Under the zoning code "business establishments" with a "principal use" as "restaurants and taverns" are listed as under the permitted uses in the C-1 District.   (Hoff Affidavit, p. 4 ¶ (4)(e) Exhibit SJ-12, Zoning Ordinance § 10.03(80) and § 10.15(4)(a)1 & (b)8).

25.     *Attorney Freeburg advised that the plaintiffs' proposed business should be treated as "similar to" an indoor theater under § 10.15(4)(c)(2) and (4). (Freeburg Dep at 8-10; Response, Answer 2).*

RESPONSE:  Partially disputed.   After the application was forward to City Attorney Freeburg, among other things, he reviewed the zoning code based on the plaintiffs' proposed use as an alcohol free "juice bar" providing nude or semi nude dance entertainment.  He concluded that:

> Under zoning regulations, if a particular use is not specifically permitted, it is to be understood to be prohibited. Reviewing the list of permitted uses in a C-1 commercial district, the public exhibition or public entertainment is not a

12

permitted use.  Those C-1 premises where public exhibition and entertainment has been as an ancillary or incidental use of a tavern, which is a permitted use.

There is no specific conditional use which addresses an establishment primarily dedicated to public exhibition or entertainment.  However, a "indoor theater" is a conditional use in a commercial district.  A conditional use, as you know, is one that is not permitted as a right, but under the proper circumstances and with the imposition of the appropriate conditions, may be granted as a conditional use in that particular zoning district.  The common dictionary definition of a theater is a building for dramatic performances or a building or area for showing motion pictures.  This does not strictly apply to the proposed activity of this public entertainment/exhibition license.  However, section 16.15(4)(c) indicates a conditional use permit can be issued for "other uses similar to or customarily incident to any of the above uses."  Therefore if this activity is going to be conducted, it would be necessary for the owner of the property to first obtain a conditional use permit.

....

In summary, based on the information available to date, it appears that an exhibition/entertainment license cannot issue pursuant to this application because at present the applicant cannot comply with section 2(dd)(3) regarding compliance with other applicable rules, regulations, ordinances and state laws.  It appears that unless the applicants surrender the alcohol licenses for the premises and obtain a conditional use permit for the proposed use, the public entertainment/exhibition license cannot issue.

(Freeburg Depo., June 30, 2004, p. 7-10; Hoff Affidavit, p. 5, p. 5, ¶ 5(c) & Exhibit SJ-17).

26.  *The City takes the position that, if sufficiently emphasized, public*

*presentation of any of the performing arts, such as singing, dancing, poetry reading,*

*piano playing, etc., results in the presenting establishment being considered as "similar*

*to" an indoor theater, and it is thus treated just as an indoor theater would be treated*

*for zoning purposes. (Freeburg Dep at 46).*

RESPONSE: Disputed.  Under the zoning code only where the "principal use" of a

"business establishment" in the C-1 District is a "use" "similar to" that provided by an

"indoor theater" is a conditional use permit is required.   (Schofield Ordinance §

10.15(4)(a)1 & (b)8)).  Where the public exhibition or entertainment is an ancillary or

incidental" use of the business, such uses are permitted in C-1 District.  (Hoff Affidavit, p.

5, p. 5, ¶ 5(c) & Exhibit SJ-17; Freeburg Deposition, p. 38-39).

27.    *An indoor theater was a conditional use in a C-1 zoning district, and that*

*meant that the plaintiffs would have to apply for a conditional use permit in order to*

*present the entertainment that they sought to present. (Freeburg Dep at 10; King Dep at*

*27; Response, Answer 2).*

RESPONSE: Disputed. In April May 2003, had the plaintiffs located their business

in a C-2, I-1, or I-2, no conditional use permit would have been required under the zoning

code .   (King Deposition, p. 41).  In addition, the type of entertainment the plaintiffs

proposed for their business did not require them to apply for a conditional use permit, but

the fact that the "*principal* use" of their proposed business was the provision of public

entertainment and exhibition was what triggered the need for a conditional use permit in the C-1 District.   (Freeburg Depo., June 30, 2004, p. 7-10; Hoff Affidavit, p. 5, p. 5, ¶ 5(c) & Exhibit SJ-17).   Further, their proposed business was not an "Indoor Theater" under the zoning code, but was treated  "similar to" to a "use" as that provided by an "indoor theater." (Freeburg Depo., June 30, 2004, p. 7-10; Hoff Affidavit, p. 5, p. 5, ¶ 5(c) & Exhibit SJ-17).

28.     *Kraimer and Morrell were subsequently contacted by the City of Schofield, through Clerk Narlock's office, and told that they needed to apply also for a conditional use permit. (Morrell Dep at 43).*

RESPONSE: Disputed.   City Attorney Philip Freeburg contacted the plaintiffs' counsel Jeff Scott Olson in early May to discuss Attorney Olson's concerns regarding the public entertainment license, at which point Attorney Freeburg informed Attorney Olson of his opinion of the need for Edward Kraimer to obtain a conditional use permit to operate the proposed business at the Grand Avenue location.  Tracey Hoff, as City Clerk, was not involved with or responsible for any zoning or conditional use determinations.  (Defendant's Supplemental Response to Plaintiff's First Interrogatory, p.2, #1).  After the city attorney had informed the plaintiffs a conditional use permit would be required, Hoff assisted Kraimer and Morrell in filling out an application for a conditional use permit when they came to the City offices. (Defendant's Supplemental Response to Plaintiff's First Interrogatory, p.2, #1).

29.     *On May 16, 2003, plaintiffs Kraimer and Morrell applied for a*

*conditional use permit to operate at their location as a non-alcohol serving operation offering adult dance entertainment. (Complaint, ¶ 404; admitted in Defendant's Answer, ¶ 9; Freeburg Dep at 11).*

RESPONSE: Partially disputed.  The application for the conditional use permit was filed only by Edward Kraimer. (Edward Kraimer Deposition, p. 55-56, Exhibit 2).

30.    *A public hearing on the plaintiffs' application was held before the Plan Commission on June 4, 2003. (Freeburg Dep at 12).*

RESPONSE: Undisputed.

31.    *The zoning code contained only one time limit in regard to applications for conditional use permits, a requirement that the City Council act within 90 days of its receipt of the recommendation of the Plan Commission.  (Freeburg Dep at 13-14; King Dep at 30).*

RESPONSE: Disputed.   The zoning code states that: "If an application for a property conditional use it [sic] not acted upon finally by the City Council within 90 days of the date upon which such application is received by the City Council, it shall be deemed to have been denied."  (Schofield Ordinance § 10.10 (5)).  Further, while the zoning code itself only referenced one specific time limit for conditional use permit applications, (Schofield Ordinance § 10.10 (4) & (5)), the appeals process to the City Zoning Board of Appeals also contains the necessary time limits required under Wis. Stat. Sec. 62.23(7),

(Schofield Ordinance § 10.07 (4)).   (Hoff Affidavit, p. 4, ¶ 5(e) & Exhibit SJ-12).   In addition, the requirements of Wis. Stat. Sec. 62.23(6) & (7), including all time limits, also apply to applications for conditional use permits in the City of Schofield.   *See* Wis. Stat. Sec. 62.23.

32.   *Specifically, the zoning code did not limit the time after its receipt of an application for a conditional use permit within which the Plan Commission would have to hold a hearing, nor did it limit how long after the required public hearing the Plan Commission would have to issue its recommendation to the City Council, and it still does not limit either period. (Freeburg Dep at 14, 15; King Dep. at 30).*

RESPONSE: Partially disputed.  The zoning code states that: "If an application for a property conditional use it [sic] not acted upon finally by the City Council within 90 days of the date upon which such application is received by the City Council, it shall be deemed to have been denied."   (Schofield Ordinance § 10.10 (5)).   Moreover, while the zoning code itself only referenced one specific time limit for conditional use permit applications, (Schofield Ordinance § 10.10 (4) & (5)), the appeals process to the City Zoning Board of Appeals also contains the necessary time limits required under Wis. Stat. Sec. 62.23(7), (Schofield Ordinance § 10.07 (4)).   (Hoff Affidavit, p. 4, ¶ 5(e) & Exhibit SJ-12).   In addition, the requirements of Wis. Stat. Sec. 62.23(6) & (7), including all time limits, also apply to applications for conditional use permits in the City of Schofield.   *See* Wis. Stat.

Sec. 62.23.

33.  *The City Council is not free to act upon an application for a conditional use permit until the Plan Commission forwards its findings and recommendations. (Freeburg Dep at 15).*

RESPONSE: Partially disputed.  Although based on his cursory review of the code at the time of his deposition, Attorney Freeburg gave this opinion that the City Council could not act on a request for a conditional use permit independently, Wis. Stat. Sec. 62.23(7)(e), does grant such powers to city councils.  *See* Wis. Stat. Sec. 62.23(7)(e).

34.  *On June 4, 2003, the Plan Commission recommended to the City Council that the plaintiffs' application for a conditional use permit be denied. (Freeburg Dep at 12, 20).*

RESPONSE: Undisputed.

35.  *On June 10, 2003, the Schofield City Council denied the plaintiffs' application for a conditional use permit and their application for a public entertainment permit. (Complaint, ¶ 407; admitted in Defendant's Answer, ¶ 12; Freeburg Dep at 12, 20-21).*

RESPONSE:  Undisputed.

36.  *The application for a public entertainment permit was denied for the stated reason that, without the conditional use permit, the plaintiffs could not operate*

18

*lawfully at their location. (Freeburg Dep at 20; Response, Item # 4 in Minutes of June*

*10, 2003 City Council Meeting, in Exhibit A).*

RESPONSE: Partially disputed.  The specific basis for the denial was:

> #4   Public Entertainment/Exhibition License by Ed
> Kraimer: Motion by Szekeress, seconded by Kevin Fable that
> the license be denied because it does not meet the current
> zoning regulations. Carried by unanimous roll call vote.

(Hoff Affidavit, p. 3 ¶ 3(c) & Exhibit SJ-3).

37.    *After their applications for a public entertainment license*

*and a conditional use permit were denied, the plaintiffs opened their tavern, Grand*

*Daddy's, as a sports bar with its bartenders dressed in bikinis, on July 11, 2003, in*

*order to make some use of the tavern while hoping that the ordinances that kept them*

*from offering nude dance entertainment would quickly be found unconstitutional so that*

*they could then offer nude dance. (Morrell Dep. at 28-29, 50; Kraimer Declaration,*

*¶8).*

RESPONSE: Partially disputed.  Kraimer was a silent partner of the business and

not the day-to-day manager of the business, and he testified that he was not "going to have

anything to do with the day-to-day operations" of the business and that Gerald Morrell

would be the only one testifying about how the business would be run.  (Edward Kraimer

Deposition, p. 36-37).   Gerald Morrell testified (1) that the Schofield Ordinance

prohibiting alcohol in adult businesses did not have any impact on their business plan

19

because they never intended to serve alcohol at the business (Gerald Morrell Deposition, p. 22); (2) that from the very beginning he and his wife only wanted to operate their proposed business as a *non*-alcoholic adult business featuring nude or semi-nude dancing (Gerald Morrell Deposition, p. 20-21); (3) that "alcohol wasn't going to be part of [their] income generating structure (Gerald Morrell Deposition, p. 21);" and (4) that Edward Kraimer was aware of this from the early stages of the planning (Gerald Morrell Deposition, p. 21).

38.     *On July 24, 2003, about three months after the plaintiffs applied for their permits, the Schofield City Council enacted an amendment to its zoning code, § 10.15(6)(g), (hereinafter "new zoning provision") which became effective on July 28, 2003. (Complaint, ¶ 409; admitted in Defendant's Answer, ¶ 14.)*

RESPONSE: Undisputed.

39.     *The new zoning provision created a new category of land use called adult-oriented establishment which is a permitted use in zoning district I-1, Limited Industrial and I-2. (Complaint, ¶ 410; admitted in Defendant's Answer, ¶ 14.)*

RESPONSE: Undisputed.

40.     *Prior to the passage of the new zoning provision, adult entertainment was not addressed as a separate use in the zoning code, but was treated as indoor theater use and was allowed in zoning area C-1 as a conditional use (subject to the requirement of obtaining a conditional use permit) and in areas C-2, I-1, and I-2 as a permitted use.*

20

*(Response, Answer 2; King Dep at 9-11, 15)*.

RESPONSE:  Disputed.  The zoning code was silent regarding a type of business for which its principal use was dedicated to adult entertainment, meaning the zoning code made no distinction between a business with a principal use dedicated to *adult* public entertainment and exhibition and a business with a principal use dedicated  to *non-adult* entertainment and exhibition.  (Freeburg Depo., June 30, 2004, p. 7-10; Hoff Affidavit, p. 5, p. 5, ¶ 5(c) & Exhibit SJ-17).

Thus, on May 6, 2004, City Attorney Freeburg sent the mayor an opinion letter discussing the plaintiffs' application and, among other things, his opinion that under the City's zoning code, the plaintiffs' proposed non-alcoholic adult business, with a self-professed principal use of featuring nude or semi-nude dancing entertainment, would require a conditional use permit to operate in the C-1 District.  (Freeburg Depo., June 30, 2004, p. 7-9; Hoff Affidavit, p. 5, p. 5, ¶ 5(c) & Exhibit SJ-17).   Freeburg concluded in his May 6 letter the following:

> I do have some observations that are implicated by the zoning code.  Under zoning regulations, if a particular use is not specifically permitted, it is to be understood to be prohibited.  Reviewing the list of permitted uses in a C-1 commercial district, the public exhibition or public entertainment is not a permitted use.  Those C-1 premises where public exhibition and entertainment has been as an ancillary or incidental use of a tavern, which is a permitted use.

21

There is no specific conditional use which addresses an establishment primarily dedicated to public exhibition or entertainment. However, a "indoor theater" is a conditional use in a commercial district. A conditional use, as you know, is one that is not permitted as a right, but under the proper circumstances and with the imposition of the appropriate conditions, may be granted as a conditional use in that particular zoning district. The common dictionary definition of a theater is a building for dramatic performances or a building or area for showing motion pictures. This does not strictly apply to the proposed activity of this public entertainment/exhibition license. However, section 16.15(4)(c) indicates a conditional use permit can be issued for "other uses similar to or customarily incident to any of the above uses." Therefore if this activity is going to be conducted, it would be necessary for the owner of the property to first obtain a conditional use permit.

....

In summary, based on the information available to date, it appears that an exhibition/entertainment license cannot issue pursuant to this application because at present the applicant cannot comply with section 2(dd)(3) regarding compliance with other applicable rules, regulations, ordinances and state laws. It appears that unless the applicants surrender the alcohol licenses for the premises and obtain a conditional use permit for the proposed use, the public entertainment/exhibition license cannot issue.

(Freeburg Depo., June 30, 2004, p. 7-10; Hoff Affidavit, p. 5, p. 5, ¶ 5(c) & Exhibit SJ-17). However, a business with a subordinate or incidental use of public entertainment and exhibition could have been either a permitted or conditional use under the zoning code

22

depending on the zoning district classification.  (Freeburg Depo., June 30, 2004, p. 7-10; Hoff Affidavit, p. 5, p. 5, ¶ 5(c) & Exhibit SJ-17).

41.    *The passage of the new zoning code, which allows adult entertainment only in areas zoned I-1 and I-2, has reduced the area within the City of Schofield where adult entertainment is allowed. (King Dep at 15).*

RESPONSE: Partially disputed.  The amended zoning code only limits the location of "commercial establishments" characterized as "adult-oriented establishments" and does not effect  *all* "adult entertainment" only those that fall within the commercial activities listed in the ordinance.  *See* Schofield Ordinance §  10.15(1)(b)(36) & 10.15(6)(g)  (Hoff Affidavit, p. 4,¶ 4(f) & Exhibit SJ-13).

42.    *In the fall of 2003, Grand Daddy's applied for and received an entertainment permit to present Karaoke entertainment; other than Karaoke they offered no entertainment until December, 2003. (Morrell Dep at 28-29, 50, 69).*

RESPONSE: Undisputed.

43.    *On November 10, 2003, the Plaintiffs in this action filed a motion for a preliminary injunction against the enforcement of the public entertainment ordinance. (Docket, # 5.) In response to this motion the City agreed not to enforce the ordinance and the Plaintiffs withdrew their motion. (Docket, # 8.) On December 1, 2003, after the City agreed not to enforce its public entertainment ordinance, the plaintiffs changed*

23

*their format at the tavern to offer dance entertainment, presenting dancers dressed in*

*bikinis. (Morrell Dep at 29, 52; Kraimer Dep at 78).*

RESPONSE: Undisputed.

44.    *The public entertainment ordinance, §11.22, was repealed on December*

*9, 2003. (Freeburg Dep at 25).*

RESPONSE: Disputed only to the extent that the Ordinance in question is actually

properly identified as Schofield Ordinance § 11.20, and became effective on December 17,

2003. (Tracey Hoff Affidavit, p. 4, ¶ 4(a), Exhibit SJ-8).

45.    *On the same date, the city enacted Ordinance §16.03 1A, which interprets*

*its intent in passing the new zoning code provision as not meaning to repeal §16.03.*

*(King Dep, Exhibit 12).*

RESPONSE: Disputed only to the extent Ordinance 16.03-1A did more than the

above, and further, the Ordinance specifically provides:

> (8) Interpretation
>
> It is not, nor has it ever been, the intent of the Schofield City Counsel to
> repeal this ordinance or create conflict with this ordinance by enacting any
> zoning ordinances that include Establishments Dealing in Alcoholic
> Beverages which are licensed under this chapter of the ordinances and the
> land use provisions of chapter 10 of the Schofield Code of Ordinances.
> Conflicts, if any, between this ordinance and any other provisions
> addressing the same or similar subject matter are to be harmonized and
> reconciled to effect the purposes and policies of the laud use and licensing
> regulations.

(Hoff Affidavit, p. 4, ¶ 4(d) & Exhibit SJ-11).

24

46.    *After the plaintiffs began to offer bikini dancing, they had a stage built and a separate room was set aside to be used as a room for the dancers to leave their belongings and for the staff to use for taking breaks and eating meals. (Kraimer Dep at 90-91).*

RESPONSE: Partially disputed to the extent that Gerald Morrell testified that the new room was also used by the dancers for changing clothes, and that among other things, the room was specifically built for that purpose. (Gerald Morrell Deposition, p. 54).

47.    *The plaintiffs did not apply for a building permit before making these changes to the property. (Kraimer Dep at 91; Freeburg Dep at 42).*

RESPONSE: Undisputed.

48.    *When these changes came to the attention of the City Building Inspector, the plaintiffs were required to apply retroactively for a building permit and to pay double the fee; this is something which happens frequently. (Freeburg Dep at 42-44).*

RESPONSE: Partially disputed.  In late 2003, the City first became aware that Grand Daddy's had constructed a permanent stage and dressing room without first obtaining a building permit.  (Defendant's Response to Plaintiff's First Interrogatory, p.3, #3).  The City's investigation of the site showed that the permanent stage and dressing room were being used for regular rather than incidental performances and live entertainment exhibitions inside the business, thereby altering the use of the premises from

25

a tavern or restaurant with incidental entertainment, which was permitted in the C-1 District, to an "indoor theater" primarily providing public performances and live entertainment, thereby, requiring a "conditional use" permit in the C-1 District. (Defendant's Response to Plaintiff's First Interrogatory, p.3, #3). The City building inspector informed the plaintiffs of this violation and the need to obtain an ex post facto building permit. (King Depo., June 30, 2004, at p. 23-24).

In addition dispute that this occurs "frequently," City Attorney testified only that people filing for building permits after the fact is a "regular" occurrence. (Freeburg Deposition, p. 44).

49.    *The plaintiffs did pay their double fee and apply for a building permit, and their application for a building permit was denied by the City Council. (Freeburg Dep at 43).*

RESPONSE: Undisputed.

50.    *The denial was based solely on the opinion of the City Attorney and the City Council that the plaintiffs, by building a stage from which to offer dance entertainment, had converted their primary use from a tavern, which is a permitted use in C-1, to an indoor theater, which is a conditional use in C-1, and as the plaintiffs had not reapplied for a conditional use permit, they were in violation of the zoning code. (Freeburg Dep at 32, 38-39, 44-46).*

26

RESPONSE: Partially disputed only to the extent  the City's investigation of the site showed that the permanent stage and dressing room were being used for regular rather than incidental performances and live entertainment exhibitions inside the business, thereby altering the use of the premises from a tavern or restaurant with incidental entertainment, which was permitted in the C-1 District, to an "indoor theater" primarily providing public performances and live entertainment, thereby, requiring a "conditional use" permit in the C-1 District.  (Defendant's Response to Plaintiff's First Interrogatory, p.3, #3).

51.   *The plaintiffs presently continue to operate Grand Daddy's as a tavern which offers dance entertainment, with the dancers dressed in bikinis. (Kraimer Dep at 78).*

RESPONSE: Presumed undisputed.

52.   When asked on June 30, 2004, what use the plaintiffs' business is under the zoning code, Zoning Administrator Kevin James King said he did not know. (King Dep at 24).

RESPONSE: Disputed.  King testified that at his deposition, he did not "have an opinion as far as what use it is" and that was because he was new on the job as the zoning administrator for the City of Schofield, and that when he was uncertain about what a given use was under the zoning code, he would regularly seek the advice of City Attorney Freeburg.  (King Deposition, p. 24-25).

27

53.     *There has never been a business establishment in Schofield that presented burlesque dance entertainment. (King Dep at 15).*

RESPONSE: Partially disputed.  King testified that there has never been an adult entertainment business in the 38 years he had lived in the City of Schofield.  (King Deposition, p. 15).

54.     *Although other taverns offer entertainment, none have been treated as indoor theaters for zoning purposes. (King Dep at 12).*

RESPONSE: Disputed to the extent that other taverns offering entertainment are not located in C-1 Districts in which such a conditional use permit would be required.  (King Deposition, p. 12).  Further, taverns offering incidental entertainment and not "primarily" offering entertainment as the principal use of the business would not be required to obtain a conditional use permit.  (Freeburg Deposition, p. 37-39; Hoff Affidavit, p. 5, p. 5, ¶5(c) & Exhibit SJ-17).

55.     *When asked whether presenting live entertainment in a tavern changes its zoning use from tavern to indoor theater, Zoning Administrator Kevin James King said that he had no opinion. (King Dep at 13).*

RESPONSE: Disputed.  King also testified that it would depend on what the typical use of the building was.  (King Deposition, p. 14).

56.     *When asked if it were typical to offer live entertainment in taverns, (as an*

28

*auxiliary use), then would offering such entertainment change the use, for zoning*

*purposes, from a tavern to an indoor theater, Administrator Kevin James King said that*

*it would not. (King Dep at 14-15).*

RESPONSE: Disputed.  King testified that it would "probably not" change its use,
however, City Attorney Freeburg testified that such a determination for zoning purposes
would depend on what the primary use of the building was, i.e. was it primarily for the
provision and display of entertainment, or was such entertainment incidental to the
principal use of the building as a tavern, and further if, once in a while a child performs a
piano recital in a house that house would not be an indoor theater under the code, similarly
if bar had a karaoke machine; but if a structure such as a stage was built and it was clear
the building was going to be used as a "show place, entertainment facility" for the
"presentation of entertainment" then under the zoning code the closest thing that would
describe such a use is an indoor theater.  (Freeburg Deposition, p. 37-39; King Deposition,
p. 15).

57.     *Had there been no regulations that prohibited them from doing so, the*

*plaintiffs would have been presenting nude or semi-nude erotic dancers for the*

*entertainment of their customers, beginning in April, 2003. (Kraimer Dep at 80, 81;*

*Morrell Dep at 22; Kraimer Declaration, ¶¶ 3,4,5).*

RESPONSE: Disputed.   Had the plaintiffs decided to open their non-alcoholic

facility providing nude or semi-nude entertainment  in any C-2, I-1, or I-2 zoning district, including those located on Grand Avenue, or in another tavern already owned and operated by Edward Kraimer at 320 Ross Avenue in the City of Schofield, they would have been able to present nude or semi-nude erotic dancers for the entertainment of their customers, beginning in April, 2003.  (King Deposition, p. 8, 41; Kraimer Deposition, p. 10-11). The reason for this is that the only reason the public entertainment license was denied was because the plaintiffs did not received a conditional use permit for the Grand Avenue location in the C-1 District. (Hoff Affidavit, p. 3 ¶ 3(c) & Exhibit SJ-3).   Such a conditional use permit would not have been required in any of the above locations and as such the plaintiffs could have opened and ran their proposed non-alcoholic business in any of those locations in April 2003.  (King Deposition, p. 41).

58.   *Had their applications for a conditional use permit and a public entertainment license been granted, instead of denied, in June, 2003, the plaintiffs would have begun offering nude entertainment in June, 2003. (Kraimer Declaration, ¶ 6).*

RESPONSE: Disputed.  Had the plaintiffs decided to open their non-alcoholic facility providing nude or semi-nude entertainment in any C-2, I-1, or I-2 zoning district, including those located on Grand Avenue, or in another tavern already owned and operated by Edward Kraimer at 320 Ross Avenue in the City of Schofield, they would have been

able to present nude or semi-nude erotic dancers for the entertainment of their customers, beginning in April, 2003.  (King Deposition, p. 8, 41; Kraimer Deposition, p. 10-11). The reason for this is that the only reason the public entertainment license was denied was because the plaintiffs did not received a conditional use permit for the Grand Avenue location in the C-1 District. (Hoff Affidavit, p. 3 ¶ 3(c) & Exhibit SJ-3).   Such a conditional use permit would not have been required in any of the above locations and as such the plaintiffs could have opened and ran their proposed non-alcoholic business in any of those locations in April 2003.  (King Deposition, p. 41).

59.   *The plaintiffs did not present any dance entertainment until an agreement was reached with the city that the city would not enforce § 11.22 out of fear of incurring prosecution and penalties under §11.22. (Kraimer Declaration, ¶15).*

RESPONSE: Disputed to the extent the plaintiffs received a public entertainment license from the City in August 2003 for karaoke entertainment and that had the plaintiffs decided to open their non-alcoholic facility providing nude or semi-nude entertainment  in any C-2, I-1, or I-2 zoning district, including those located on Grand Avenue, or in another tavern already owned and operated by Edward Kraimer at 320 Ross Avenue in the City of Schofield, they would have been able to present nude or semi-nude erotic dancers for the entertainment of their customers, beginning in April, 2003.  (King Deposition, p. 8, 41; Kraimer Deposition, p. 10-11).   The reason for this is that the only reason the

public entertainment license was denied was because the plaintiffs did not received a conditional use permit for the Grand Avenue location in the C-1 District. (Hoff Affidavit, p. 3 ¶ 3(c) & Exhibit SJ-3). Such a conditional use permit would not have been required in any of the above locations and as such the plaintiffs could have opened and ran their proposed non-alcoholic business in any of those locations in April 2003. (King Deposition, p. 41).

60.     *The plaintiffs still have not presented nude dance entertainment because of fear of incurring prosecution and penalties under the "old" zoning code, the new zoning code provisions, and §16.03. (Kraimer Declaration, ¶16).*

RESPONSE: Disputed to the extent that the primary reason the plaintiffs have not presented nude dance entertainment is that they chose their proposed business in the C-1 District. Had the plaintiffs decided to open their non-alcoholic facility providing nude or semi-nude entertainment in any C-2, I-1, or I-2 zoning district, including those located on Grand Avenue, or in another tavern already owned and operated by Edward Kraimer at 320 Ross Avenue in the City of Schofield, they would have been able to present nude or semi-nude erotic dancers for the entertainment of their customers, beginning in April, 2003. (King Deposition, p. 8, 41; Kraimer Deposition, p. 10-11). The reason for this is that the only reason the public entertainment license was denied was because the plaintiffs did not received a conditional use permit for the Grand Avenue location in the C-1

32

District. (Hoff Affidavit, p. 3 ¶ 3(c) & Exhibit SJ-3).  Such a conditional use permit would not have been required in any of the above locations and as such the plaintiffs could have opened and ran their proposed non-alcoholic business in any of those locations in April 2003.  (King Deposition, p. 41).

61.     *Because of their inability to present any dance entertainment at all until December 1, 2003, the plaintiffs suffered the loss of freedom of expression and also the loss of significant profits. (Kraimer Dep at 80, 81; Morrell Dep at 22; Kraimer Declaration, ¶17).*

RESPONSE: Disputed, the only reason the plaintiffs were not able to present dance entertainment was because of they chose to attempt to open their business in a C-1 District, had the plaintiffs decided to open their non-alcoholic facility providing nude or semi-nude entertainment  in any C-2, I-1, or I-2 zoning district, including those located on Grand Avenue, or in another tavern already owned and operated by Edward Kraimer at 320 Ross Avenue in the City of Schofield, they would have been able to present nude or semi-nude erotic dancers for the entertainment of their customers, beginning in April, 2003.  (King Deposition, p. 8, 41; Kraimer Deposition, p. 10-11).  The reason for this is that the only reason the public entertainment license was denied was because the plaintiffs did not received a conditional use permit for the Grand Avenue location in the C-1 District. (Hoff Affidavit, p. 3 ¶ 3(c) & Exhibit SJ-3).  Such a conditional use permit would not have been

required in any of the above locations and as such the plaintiffs could have opened and ran their proposed non-alcoholic business in any of those locations in April 2003.  (King Deposition, p. 41).

62.   *Because of their inability to present nude dance entertainment, even after December 1, 2003, due to the new zoning provision, the plaintiffs suffered the loss of freedom of expression and also the loss of significant profits. (Kraimer Dep at 80, 81; Morrell Dep at 22; Kraimer Declaration, ¶18).*

RESPONSE: Disputed.  Even under the new zoning provision, the plaintiffs could operate their business and present nude dance entertainment in a least 30 different sites in the City of Schofield, including another business owned by Edward Kraimer.  (King Depo., p. 8-9, 32-40, 42-43; Kraimer Depo., p. 10-11).

63.   *Because of their inability to both present nude dance entertainment and also to sell alcoholic beverages, due to the Adult Entertainment Ordinance, §16.03, the plaintiffs suffered the loss of freedom of expression and also the loss of significant profits. (Kraimer Dep at 80, 81; Morrell Dep at 22; Kraimer Declaration, ¶ 19).*

RESPONSE: Disputed.  Even under the new zoning provision, the plaintiffs could operate their business and present nude dance entertainment in a least 30 different sites in the City of Schofield, including another business owned by Edward Kraimer.  (King Depo., p. 8-9, 32-40, 42-43; Kraimer Depo., p. 10-11).  Further, under controlling case

law, there is no First Amendment right to sell alcohol and present nude dance entertainment.  *See Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702 (7th Cir. 2003); *City of Erie v. Pap's A.M.,* 529 U.S. 277 (2000).

64.    If they could now do so without violating any law, the plaintiffs prefer to both present nude dance entertainment and to sell alcohol by the drink to their customers at Grand Daddy's. (Kraimer Declaration, ¶¶ 13, 14, 20).

RESPONSE:  Disputed.  Even under the new zoning provision, the plaintiffs could operate their business and present nude dance entertainment in a least 30 different sites in the City of Schofield, including another business owned by Edward Kraimer.  (King Depo., p. 8-9, 32-40, 42-43; Kraimer Depo., p. 10-11).  Further, under controlling case law, there is no First Amendment right to sell alcohol and present nude dance entertainment.  *See Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702 (7th Cir. 2003); *City of Erie v. Pap's A.M.,* 529 U.S. 277 (2000).  Further, Gerald Morrell testified: (1) that the Schofield Ordinance prohibiting alcohol in adult businesses did not have any impact on their business plan because they never intended to serve alcohol at the business (Gerald Morrell Deposition, p. 22); (2) that from the very beginning he and his wife only wanted to operate their proposed business as a *non*-alcoholic adult business featuring nude or semi-nude dancing (Gerald Morrell Deposition, p. 20-21); (3) that "alcohol wasn't going to be part of [their] income generating structure (Gerald Morrell Deposition, p. 21);"

(4) that Edward Kraimer was aware of this from the early stages of the planning (Gerald

Morrell Deposition, p. 21).

## RELEVANT PROVISIONS OF SCHOFIELD CITY ORDINANCES

65.    *Prior to the December, 2003 repeal of this ordinance, a license*

*was required for a nonliquor establishment to "exhibit to public view for gain within the*

*corporate limits of the City, any circus caravan, theatrical performance, slight of hand*

*performance, or ... any other kind of entertainment or exhibition where admission is*

*gained by payment of money...." § 11.22(a)(1).*

RESPONSE: Disputed only to the extent the quoted text of the ordinance conflicts

with the full language of the Ordinance as set forth in the Exhibits accompanying the

Affidavit of Tracey Hoff, and further, that the language of the Ordinance speaks for itself

and must be viewed within the context of all of the relevant ordinances contained in the

Schofield Code.   Further, the Ordinance in question is actually properly identified as

Schofield Ordinance § 11.20. (Tracey Hoff Affidavit, p. 4, ¶ 4(a), Exhibit SJ-8).

66.    *A liquor-licensed establishment could not present "entertainment or*

*exhibitions consisting of music, dancing, singing, floor shows and/or other cabaret*

*performances" unless licensed. § 11.22 (b)(1).*

RESPONSE: Disputed only to the extent the quoted text of the ordinance conflicts

with the full language of the Ordinance as set forth in the Exhibits accompanying the

36

Affidavit of Tracey Hoff, and further, that the language of the Ordinance speaks for itself and must be viewed within the context of all of the relevant ordinances contained in the Schofield Code.  Further, the Ordinance in question is actually properly identified as Schofield Ordinance § 11.20. (Tracey Hoff Affidavit, p. 4, ¶ 4(a), Exhibit SJ-8).

67.    *The license was "construed to permit entertainment, exhibitions, instrumental music, prerecorded music, and patron dancing" on the licensed premises. § 11.22 (b)(1).*

RESPONSE: Disputed only to the extent the quoted text of the ordinance conflicts with the full language of the Ordinance as set forth in the Exhibits accompanying the Affidavit of Tracey Hoff, and further, that the language of the Ordinance speaks for itself and must be viewed within the context of all of the relevant ordinances contained in the Schofield Code.  Further, the Ordinance in question is actually properly identified as Schofield Ordinance § 11.20. (Tracey Hoff Affidavit, p. 4, ¶ 4(a), Exhibit SJ-8).

68.    *The City Council was required to approve the application for a license whenever it found the following:*
*all the statements in application are true;*
*the applicant is "of good moral character and reputation";*
*the premises will comply with all applicable regulations, including zoning, building code and fire prevention code;*
*the proposed entertainment will comply with all applicable regulations including but not limited to "noise limitations and performance standards;"*

RESPONSE: Disputed only to the extent the quoted text of the ordinance conflicts with the full language of the Ordinance as set forth in the Exhibits accompanying the

Affidavit of Tracey Hoff, and further, that the language of the Ordinance speaks for itself and must be viewed within the context of all of the relevant ordinances contained in the Schofield Code.  Further, the Ordinance in question is actually properly identified as Schofield Ordinance § 11.20. (Tracey Hoff Affidavit, p. 4, ¶ 4(a), Exhibit SJ-8).

68.    *(5) a corporate applicant is licensed to do business and in good standing with the state;  "the applicant is otherwise entitled to a license under the other provisions of this section. (§ 11.22 (c) (2) (dd)).*

RESPONSE: Disputed only to the extent the quoted text of the ordinance conflicts with the full language of the Ordinance as set forth in the Exhibits accompanying the Affidavit of Tracey Hoff, and further, that the language of the Ordinance speaks for itself and must be viewed within the context of all of the relevant ordinances contained in the Schofield Code.  Further, the Ordinance in question is actually properly identified as Schofield Ordinance § 11.20. (Tracey Hoff Affidavit, p. 4, ¶ 4(a), Exhibit SJ-8).

69.    *Ordinance § 16.03 applies to "establishments dealing in alcoholic beverages," defined to include any business licensed by the state for sale and/or service of alcoholic beverages including any "bottle club, hotel, motel, restaurant, night club, country club, cabaret, meeting facility utilized by any religious, social, fraternal or similar organization, …"  or any business  where the consumption of alcohol is permitted.  §16.03 (5).*

RESPONSE: Disputed only to the extent the quoted text of the ordinance conflicts with the full language of the Ordinance as set forth in the Exhibits accompanying the Affidavit of Tracey Hoff, and further, that the language of the Ordinance speaks for itself and must be viewed within the context of all of the relevant ordinances contained in the Schofield Code.

70.     *In such establishments, "no person shall expose to public view his or her genitals, pubic area, vulva, anus, anal cleft or buttocks or any simulation thereof." § 16.03 (6) (a).*

RESPONSE: Disputed only to the extent the quoted text of the ordinance conflicts with the full language of the Ordinance as set forth in the Exhibits accompanying the Affidavit of Tracey Hoff, and further, that the language of the Ordinance speaks for itself and must be viewed within the context of all of the relevant ordinances contained in the Schofield Code.

71.     *No female person shall expose any portion of her breast below the top of the areola or any simulation thereof. § 16.03 (6) (b).*

RESPONSE: Disputed only to the extent the quoted text of the ordinance conflicts with the full language of the Ordinance as set forth in the Exhibits accompanying the Affidavit of Tracey Hoff, and further, that the language of the Ordinance speaks for itself and must be viewed within the context of all of the relevant ordinances contained in the

Schofield Code.

72.     *No person operating such establishment shall permit any person to expose such parts. § 16.03 (6) (c) and (d).*

RESPONSE: Disputed only to the extent the quoted text of the ordinance conflicts with the full language of the Ordinance as set forth in the Exhibits accompanying the Affidavit of Tracey Hoff, and further, that the language of the Ordinance speaks for itself and must be viewed within the context of all of the relevant ordinances contained in the Schofield Code.

73.     *No person operating such establishment shall permit any "sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, any sexual act prohibited by law, touching, caressing, fondling of the breast, buttocks, anus or genitals or the simulation thereof." § 16.03 (6) (e).*

RESPONSE: Disputed only to the extent the quoted text of the ordinance conflicts with the full language of the Ordinance as set forth in the Exhibits accompanying the Affidavit of Tracey Hoff, and further, that the language of the Ordinance speaks for itself and must be viewed within the context of all of the relevant ordinances contained in the Schofield Code.

74.     *No person operating such establishment shall permit the graphic representation, including pictures or projection of film which depict any of the*

*prohibited body parts or moves or the simulation thereof. § 16.03 (6) (f).*

RESPONSE: Disputed only to the extent the quoted text of the ordinance conflicts with the full language of the Ordinance as set forth in the Exhibits accompanying the Affidavit of Tracey Hoff, and further, that the language of the Ordinance speaks for itself and must be viewed within the context of all of the relevant ordinances contained in the Schofield Code.

75. *Penalties include revocation of liquor license as well as daily forfeitures §*
*16.03 (7) (a) and (b).*

RESPONSE: Disputed only to the extent the quoted text of the ordinance conflicts with the full language of the Ordinance as set forth in the Exhibits accompanying the Affidavit of Tracey Hoff, and further, that the language of the Ordinance speaks for itself and must be viewed within the context of all of the relevant ordinances contained in the Schofield Code.

76. *On December 9, 2003, the City amended § 16.03 to disavow any intent to*
*have repealed it by passing the July, 2003, adult entertainment zoning provisions and to*
*memorialize certain "findings," in which the city claimed to have conducted further*
*study of the off-site, secondary effects of adult-oriented businesses and to have*
*discerned that those studies documented the negative secondary effects of adult-oriented*
*businesses serving alcohol. §16.03(3a).*

41

RESPONSE: Disputed to the extent the proposed characterization by the
plaintiffs conflicts with the actual text of the ordinance that provides:

(3a) Supplemental Findings

Since the original enactment of this ordinance, the City has conducted
further study and review of the off-site, secondary effects of adult-
oriented businesses. The summary and conclusions of this review are
stated in Section 10.15(6)(g)(l) of the Schofield Code of Ordinances
relating to zoning of Adult Oriented Establishments. These finding are
hereby adopted by reference and incorporated in this ordinance to
supplement the original findings and statement of purpose of this Section
made at its original enactment.

In addition to the sources referred to in Section 10.15(6)(g) of the
Schofield Code of Ordinances, the City has considered the studies,
findings and enactments of the City of Los Angeles. Study by the
Attorney General of Minnesota Working Group on Sexually Oriented
Business, the findings of the Village of Somerset, Wisconsin and reported
judicial decisions involving regulations relating to the consumption of
alcohol on premises of adult oriented businesses. These sources document
the negative secondary effects of adult-oriented business serving alcohol.
It is hereby the finding of the City Council that the negative secondary
effects of adult oriented-business noted in the Schofield Zoning Code are
not mitigated by the service and consumption of alcohol, but instead the
negative effects are enhanced or exacerbated by the service and
consumption of alcohol at such businesses.

Section 2: Section 16.03(8) of the Schofield Code of Ordinances is hereby
created to provide as follows:

(8) Interpretation

It is not, nor has it ever been, the intent of the Schofield City Counsel to
repeal this ordinance or create conflict with this ordinance by enacting
any zoning ordinances that include Establishments Dealing in Alcoholic
Beverages which are licensed under this chapter of the ordinances and the
land use provisions of chapter 10 of the Schofield Code of Ordinances.
Conflicts, if any, between this ordinance and any other provisions
addressing the same or similar subject matter are to be harmonized and
reconciled to effect the purposes and policies of the laud use and licensing

42

regulations.

(Hoff Affidavit, p. 4, ¶ 4(d) & Exhibit SJ-11).

77.     *The city claimed to have found that the negative effects of adult-oriented businesses are exacerbated by the service and consumption of alcohol at such businesses. § 16.03 (3a).*

RESPONSE: Disputed to the extent the proposed characterization by the plaintiffs conflicts with the actual text of the ordinance that provides:

(3a) Supplemental Findings

Since the original enactment of this ordinance, the City has conducted further study and review of the off-site, secondary effects of adult-oriented businesses. The summary and conclusions of this review are stated in Section 10.15(6)(g)(l) of the Schofield Code of Ordinances relating to zoning of Adult Oriented Establishments. These finding are hereby adopted by reference and incorporated in this ordinance to supplement the original findings and statement of purpose of this Section made at its original enactment.

In addition to the sources referred to in Section 10.15(6)(g) of the Schofield Code of Ordinances, the City has considered the studies, findings and enactments of the City of Los Angeles. Study by the Attorney General of Minnesota Working Group on Sexually Oriented Business, the findings of the Village of Somerset, Wisconsin and reported judicial decisions involving regulations relating to the consumption of alcohol on premises of adult oriented businesses. These sources document the negative secondary effects of adult-oriented business serving alcohol. It is hereby the finding of the City Council that the negative secondary effects of adult oriented-business noted in the Schofield Zoning Code are not mitigated by the service and consumption of alcohol, but instead the negative effects are enhanced or exacerbated by the service and consumption of alcohol at such businesses.

Section 2: Section 16.03(8) of the Schofield Code of Ordinances is hereby

43

created to provide as follows:

> (8) Interpretation
>
> It is not, nor has it ever been, the intent of the Schofield City Counsel to repeal this ordinance or create conflict with this ordinance by enacting any zoning ordinances that include Establishments Dealing in Alcoholic Beverages which are licensed under this chapter of the ordinances and the land use provisions of chapter 10 of the Schofield Code of Ordinances. Conflicts, if any, between this ordinance and any other provisions addressing the same or similar subject matter are to be harmonized and reconciled to effect the purposes and policies of the laud use and licensing regulations.

(Hoff Affidavit, p. 4, ¶ 4(d) & Exhibit SJ-11).

78.   *The amendment provides that any conflicts between §16.03 and other ordinances should be harmonized. § 16.03 (8).*

> RESPONSE:  Disputed only to the extent the ordinance provides in full:
>
> > It is not, nor has it ever been, the intent of the Schofield City Counsel to repeal this ordinance or create conflict with this ordinance by enacting any zoning ordinances that include Establishments Dealing in Alcoholic Beverages which are licensed under this chapter of the ordinances and the land use provisions of chapter 10 of the Schofield Code of Ordinances. Conflicts, if any, between this ordinance and any other provisions addressing the same or similar subject matter are to be harmonized and reconciled to effect the purposes and policies of the laud use and licensing regulations.

(Hoff Affidavit, p. 4, ¶ 4(d) & Exhibit SJ-11).

79.   *The amendment provides that it is not, nor has it ever been the intention of the City to repeal §16.03, the Adult Entertainment Ordinance. § 16.03 (8).*

> RESPONSE:  Disputed only to the extent the ordinance provides in full:
>
> > It is not, nor has it ever been, the intent of the Schofield City Counsel to

44

repeal this ordinance or create conflict with this ordinance by enacting any zoning ordinances that include Establishments Dealing in Alcoholic Beverages which are licensed under this chapter of the ordinances and the land use provisions of chapter 10 of the Schofield Code of Ordinances. Conflicts, if any, between this ordinance and any other provisions addressing the same or similar subject matter are to be harmonized and reconciled to effect the purposes and policies of the land use and licensing regulations.

(Hoff Affidavit, p. 4, ¶ 4(d) & Exhibit SJ-11).

80.     *The City of Schofield zoning code provides that a use of property is the purpose of activity for which the land or building thereon is designed, arranged, or intended or for which it is occupied or maintained. § 10.03 (79).*

RESPONSE: Undisputed.

81.     *The City of Schofield zoning code provides that a conditional use is a use which because of its "unique characteristics cannot be classified as a permitted use in a particular districts or districts." § 10.03 (82).*

RESPONSE: Disputed to the extent the full definition of a "conditional use" under the code is defined as:

A "conditional use" is a use -- either public or private -- which, because of its unique characteristics, cannot be properly classified as a permitted use in a particular district or districts.  After due consideration, in each case, of the impact of such use upon neighboring land and of the public need for the particular use at the particular location, such "conditional use" may or may not be granted, subject to the terms of this ordinance.  A conditional use permit may be granted only by the Common Council after public hearing and written recommendation by the City Plan Commission.

(Hoff Affidavit, p. 4, ¶ 4(e) & Exhibit SJ-12).

82.     *The City of Schofield ordinance governing conditional use requires that, "After due consideration, in each case, of the impact of such use upon the neighboring land and of the public need for the particular use at the particular location, such conditional use may or may not be granted, subject to the terms of this ordinance." § 10.03 (82).*

RESPONSE: Undisputed.

83.     *A conditional use permit may be granted "only by the Common Council after public hearing and written recommendation by the City Plan Commission." § 10.03 (82).*

RESPONSE: Only disputed to the extent that "conditional use permit" are also subject to the requirements of Schofield Ordinance § 10.10.

84.     *The application for a conditional use permit is filed with the City Clerk and must contain "a statement in writing by the applicant and adequate evidence showing that the proposed conditional use will conform to the standards" in § 10.10 (3) (6).*

RESPONSE: Undisputed.

85.     *The application and statement are "forwarded to the Plan Commission with a request for a public hearing and report relative thereto." § 10.10 (3).*

RESPONSE: Undisputed.

86.     *The City Plan Commission is required to hold "at least one public hearing" on the proposed conditional use. § 10.10 (4).*

RESPONSE: Undisputed

87.     *The Plan Commission is required to reports its findings and recommendations to the City Council. § 10.10 (5).*

RESPONSE: Undisputed

88.     *If an application is not acted upon by the City Council within 90 days of the date on which the Council receives the application, it is deemed to have been denied. § 10.10 (5).*

RESPONSE: Undisputed

89.     *The Plan Commission may not recommend that a conditional use permit be granted unless it finds: (a) that the operation of the conditional use will not be detrimental to the "public health, safety, morals, comfort or general welfare;" (b) that the conditional use will not injure the use and enjoyment of other property in the immediate vicinity for purposes already permitted nor substantially diminish property values; that the establishment of the conditional use will not impede the normal and orderly development and improvement of surrounding property; (d) that adequate utilities, access roads, drainage and necessary facilities are provided; (e) that adequate measures will provide ingress and egress to minimize traffic congestion; and (f) that the*

47

*conditional use shall, in all other respects, conform to the applicable regulations. §*
*10.10 (6).*

RESPONSE: Undisputed

90.   *Prior to granting any conditional use permit, "the Plan Commission may*
*recommend and the City Council shall stipulate such conditions and restrictions upon*
*the establishment, location, construction, maintenance and operation of the conditional*
*use as is deemed necessary for the protection of the public interest and to secure*
*compliance with the requirement of [§10.10(6)]". §10.10(7).*

RESPONSE: Undisputed

91.   *The area zoned C-1, First Commercial District is "designed for the*
*services and goods required for basic and occasional shopping and service needs." §*
*10.15 (4).*

RESPONSE: Undisputed.

92.   *Restaurants and taverns are listed among the permitted uses in C-1.*
*§10.15 (4)(b) 8.  A business which is a permitted use need not meet the standards in §*
*10.10 (6) and neither the Plan Commission nor the City Council must pass on its right*
*to exist; it can get an occupancy permit from the zoning administrator.*

RESPONSE: Partially undisputed.   Under the zoning code "business
establishments" with a "principal use" as  "restaurants and taverns" are listed as under the

permitted uses in the C-1 District.   (Hoff Affidavit, p. 4 ¶ (4)(e) Exhibit SJ-12, Zoning Ordinance § 10.03(80) and § 10.15(4)(a)1 & (b)8).   Further, a business listed as a "permitted use" must still "conform[] with all requirements, regulations and standards of such district."  *See* Schofield Ordinance § 10.03(81).

93.   *Indoor theaters are listed as a conditional use in the C-1 zoning area. § 10.15 (4)(c).*

RESPONSE: Undisputed.

94.   *Any use permitted as a use or conditional use in C-1 is a permitted use in C-2, Second Commercial District and in I-1 and I-2. §10.15 (5)(a).*

RESPONSE: Undisputed.

95.   *On July 24, 2003, the City Council enacted § 10.15 (6)(b)(36) and §10.15(6)(g), entitled Adult-Oriented Establishments, which took effect upon its publication on July 29, 2003.*

RESPONSE: Undisputed.

96.   *This ordinance defines Adult-Oriented Establishments as adult bookstores, novelty stores, video stores, motion picture theaters and cabarets. §10.15(6)(g)-2.*

RESPONSE:  Disputed to the extent the ordinance provides:

2.   <u>Adult-Oriented Establishments</u>. "Adult-Oriented Establishments" shall include, but is not limited to. "adult bookstores, adult novelty stores, adult video stores", "adult motion picture theaters", and "adult cabarets".  It further means any premises to which, public patrons or members of a private organization are invited or admitted and which are physically arranged so as

49

to provide booths, cubicles, rooms, compartments or stalls separate from the common areas of the premises for the purpose of viewing adult entertainment or wherein an entertainer provides adult entertainment to a member of the public, a patron or a member of a private organization, whether or not such adult entertainment is held, conducted, operated or maintained for a profit, direct or indirect.

A.   "Adult bookstore, adult novelty store or adult video store" means:

(i)   A commercial establishment which, as one of its principal purposes, offers for sale or rental for any form of consideration any one or more of the following:
(a)   Books, magazines, periodicals or other printed matter, or photographs, films,  motion pictures, video cassettes or video reproductions, slides or other visual representations which are characterized by the depiction or description of "specified sexual activities@and/or "specified anatomical areas", or

(b)   Instruments, devices or paraphernalia which are designed for use or marketed primarily for stimulation of human genital organs or for sadomasochistic use or abuse of themselves or others.

(ii)   A commercial establishment may have other principal business purposes that do not involve the offering for sale or rental of material depicting or describing "specified sexual activities" or "specified anatomical areas@and still be categorized as "adult bookstore, adult novelty store or adult video store." Such other business purposes will not serve to exempt such commercial establishments from being categorized as an adult bookstore, adult novelty store or adult video store so long as one of its principal business purposes is the offering for sale or rental for consideration the specified materials which are characterized by the depiction or description of "specified sexual activities" and/or "specified anatomical areas".

(iii)   Notwithstanding the foregoing, a commercial establishment which offers for sale or rental any of the items listed in subsection (A) of this section will not be considered to have as one of its principal business purposes the offering for sale or rental, for consideration the specified materials which are characterized by the depiction or description of "specified sexual activities" or "specified anatomical areas" provided all of the following conditions are met:

(a)   Total gross revenues from the sale or rental of any of

50

the items listed in subsection (A) do not exceed fifty percent of the commercial establishment's gross revenue;

(b)    Total gross square footage of display space and stock area devoted to the sale or rental of any of the items listed subsection (A) does not exceed fifty percent of the commercial establishment's total square footage.

(c)    No electronically, electrically, or mechanically controlled still or motion picture machines, projectors, video or laser disc players, or other image-producing devices are maintained on the premises of the commercial establishment to show images of items listed in subsection (A) to any customers or potential customers of the commercial establishment.

B      "Adult motion picture theater" means a commercial establishment which regularly features non-live performances or entertainment such as films, motion pictures, video cassettes, slides, or similar photographic reproductions which. are distinguished or characterized by an emphasis on matters exhibiting, depicting, describing or relating to Aspecified sexual activities: and/or "specified anatomical areas", as defined below, for observation by patrons therein.

C.     "Adult cabaret" means a nightclub, bar, restaurant or similar commercial establishment which regularly features:

(i)     Persons who appear in a state of nudity or semi-nudity: or

(ii)    Live performances which are characterized by the exposure of "specified anatomical areas" or by "specified sexual activities", or

(iii)   Films, motion pictures, video cassettes, slides or other photographic reproductions which are characterized by the depiction or description of Aspecified sexual activities@or "specified anatomical areas"..

D.     "Adult entertainment" means any exhibition of motion pictures, live performance. display or dance of any type, which has as its dominant theme, or is distinguished or characterized by an emphasis on, any actual or simulated "specified sexual activities", or "specified anatomical areas@ as defined below, or the removal of articles of clothing to appear totally nude or to display a nude genital area or female nude breast or breasts.

E.     "Specified sexual activities" means simulated or actual:

51

(i)   Showing of human genitals in a state of sexual stimulation or arousal; or

(ii)   Acts of masturbation, sexual intercourse, sodomy, bestiality, necrophilia, sadomasochistic abuse, fellatio or cunnilingus; or

(iii)   Fondling or erotic touching of human genitals, pubic region, buttocks or female breasts.

F.   "Specified anatomical areas" means:

(i)   Human genitals, pubic region, buttocks, anus or the areola of a female breast or breasts less than completely and opaquely covered by clothing; or

(ii)   Human male genitals in a discernibly turgid state, even if opaquely covered by clothing.

G.   An "adult-oriented establishment" must meet the following criteria:

(i)   Any customer entrance to the business shall not be located within 500 feet, as measured in a straight line, of a residence zoning district boundary located within the City of Schofield or within 500 feet of the city limits; and

(ii)   Any customer entrance to the business shall not be located within 1.000 feet, as measured in a straight line, of any customer entrance to any existing adult-oriented establishment.

(Hoff Affidavit, p. 4, ¶ 4(f) & Exhibit SJ-13).

97.   *It also includes "any premises to which public patrons or members of a private organization are invited or admitted and which are physically arranged so as to provide booths, cubicles, rooms, compartments or stalls separate from the common areas of the premises for the purpose of viewing adult entertainment or wherein an entertainer provides adult entertainment to a member of the public, a patron or a member of a private organization, whether or not such adult entertainment is held*

52

*conducted or operated for profit, direct or indirect." §10.15(6)(g)-2.*

    RESPONSE:  Disputed to the extent the ordinance provides:

2.    Adult-Oriented Establishments. "Adult-Oriented Establishments" shall include, but is not limited to. "adult bookstores, adult novelty stores, adult video stores", "adult motion picture theaters", and "adult cabarets".  It further means any premises to which, public patrons or members of a private organization are invited or admitted and which are physically arranged so as to provide booths, cubicles, rooms, compartments or stalls separate from the common areas of the premises for the purpose of viewing adult entertainment or wherein an entertainer provides adult entertainment to a member of the public, a patron or a member of a private organization, whether or not such adult entertainment is held, conducted, operated or maintained for a profit, direct or indirect.

A.    "Adult bookstore, adult novelty store or adult video store" means:

    (i)    A commercial establishment which, as one of its principal purposes, offers for sale or rental for any form of consideration any one or more of the following:
        (a)    Books, magazines, periodicals or other printed matter, or photographs, films,  motion pictures, video cassettes or video reproductions, slides or other visual representations which are characterized by the depiction or description of "specified sexual activities@and/or "specified anatomical areas", or

        (b)    Instruments, devices or paraphernalia which are designed for use or marketed primarily for stimulation of human genital organs or for sadomasochistic use or abuse of themselves or others.

    (ii)    A commercial establishment may have other principal business purposes that do not involve the offering for sale or rental of material depicting or describing "specified sexual activities" or "specified anatomical areas@and still be categorized as "adult bookstore, adult novelty store or adult video store." Such other business purposes will not serve to exempt such commercial establishments from being categorized as an adult bookstore, adult novelty store or adult video store so long as one of its principal business purposes is the offering for sale or rental for consideration the specified materials which are characterized by the depiction or description of "specified sexual activities" and/or "specified anatomical areas".

53

(iii)    Notwithstanding the foregoing, a commercial establishment which offers for sale or rental any of the items listed in subsection (A) of this section will not be considered to have as one of its principal business purposes the offering for sale or rental, for consideration the specified materials which are characterized by the depiction or description of "specified sexual activities" or "specified anatomical areas" provided all of the following conditions are met:

(a)    Total gross revenues from the sale or rental of any of the items listed in subsection (A) do not exceed fifty percent of the commercial establishment's gross revenue;

(b)    Total gross square footage of display space and stock area devoted to the sale or rental of any of the items listed subsection (A) does not exceed fifty percent of the commercial establishment's total square footage.

(c)    No electronically, electrically, or mechanically controlled still or motion picture machines, projectors, video or laser disc players, or other image-producing devices are maintained on the premises of the commercial establishment to show images of items listed in subsection (A) to any customers or potential customers of the commercial establishment.

B    "Adult motion picture theater" means a commercial establishment which regularly features non-live performances or entertainment such as films, motion pictures, video cassettes, slides, or similar photographic reproductions which. are distinguished or characterized by an emphasis on matters exhibiting, depicting, describing or relating to Aspecified sexual activities: and/or "specified anatomical areas", as defined below, for observation by patrons therein.

C.    "Adult cabaret" means a nightclub, bar, restaurant or similar commercial establishment which regularly features:

(i)    Persons who appear in a state of nudity or semi-nudity: or

(ii)    Live performances which are characterized by the exposure of "specified anatomical areas" or by "specified sexual activities", or

(iii)    Films, motion pictures, video cassettes, slides or other photographic reproductions which are characterized by the depiction or description of Aspecified sexual activities@or "specified anatomical areas"..

D.   "Adult entertainment" means any exhibition of motion pictures, live performance. display or dance of any type, which has as its dominant theme, or is distinguished or characterized by an emphasis on, any actual or simulated "specified sexual activities", or "specified anatomical areas@ as defined below, or the removal of articles of clothing to appear totally nude or to display a nude genital area or female nude breast or breasts.

E.   "Specified sexual activities" means simulated or actual:

(i)   Showing of human genitals in a state of sexual stimulation or arousal; or

(ii)   Acts of masturbation, sexual intercourse, sodomy, bestiality, necrophilia, sadomasochistic abuse, fellatio or cunnilingus; or

(iii)   Fondling or erotic touching of human genitals, pubic region, buttocks or female breasts.

F.   "Specified anatomical areas" means:

(i)   Human genitals, pubic region, buttocks, anus or the areola of a female breast or breasts less than completely and opaquely covered by clothing; or

(ii)   Human male genitals in a discernibly turgid state, even if opaquely covered by clothing.

G.   An "adult-oriented establishment" must meet the following criteria:

(i)   Any customer entrance to the business shall not be located within 500 feet, as measured in a straight line, of a residence zoning district boundary located within the City of Schofield or within 500 feet of the city limits; and

(ii)   Any customer entrance to the business shall not be located within 1.000 feet, as measured in a straight line, of any customer entrance to any existing adult-oriented establishment.

(Hoff Affidavit, p. 4, ¶ 4(f) & Exhibit SJ-13).

98.   *There is no exception for private residences. (passim).*

RESPONSE: Disputed.  Private residences uses are defined and in Sections

55

10.15 (1)-(3) of the zoning code and the new adult establishment zoning code deals only with commercial entities makes no mention of private residences.  (Hoff Affidavit, p. 4, ¶ 4(f) & Exhibit SJ-13).

99.   *An adult cabaret is defined as "nightclub, bar, restaurant or similar commercial establishment which regularly features (i) persons who appear in a state of nudity or semi-nudity, (ii) live performances which are characterized by the exposure of specified anatomical areas or specified sexual activities, or (iii) films, motion pictures, video cassettes, slides or other photographic reproductions which are characterized by the depiction or description of specified sexual activities or specified anatomical areas." §10.15(6)(g)-2-C.*

RESPONSE: Undisputed.

100.   *"Adult entertainment" means "any exhibition of motion pictures, live performance, display or dance of any type, which has as its dominant theme, or is distinguished by or characterized by an emphasis on, any actual or simulated specified sexual activities or specified anatomical areas …, or the removal of articles of clothing to appear totally nude or to displace a nude genital area or female nude breast or breasts." §10.15(6)(g)-2-D.*

RESPONSE: Disputed only to the extent the full ordinance provides:

D.   "Adult entertainment" means any exhibition of motion pictures, live performance. display or dance of any type, which has as its dominant theme, or is distinguished or characterized by an emphasis on, any

actual or simulated "specified sexual activities", or "specified anatomical areas@ as defined below, or the removal of articles of clothing to appear totally nude or to display a nude genital area or female nude breast or breasts.

E.      "Specified sexual activities" means simulated or actual:

(i)      Showing of human genitals in a state of sexual stimulation or arousal; or

(ii)      Acts of masturbation, sexual intercourse, sodomy, bestiality, necrophilia, sadomasochistic abuse, fellatio or cunnilingus; or

(iii)      Fondling or erotic touching of human genitals, pubic region, buttocks or female breasts.

F.      "Specified anatomical areas" means:

(i)      Human genitals, pubic region, buttocks, anus or the areola of a female breast or breasts less than completely and opaquely covered by clothing; or

(ii)      Human male genitals in a discernibly turgid state, even if opaquely covered by clothing.

(Hoff Affidavit, p. 4, ¶ 4(f) & Exhibit SJ-13).

101.      *"Specified sexual activities" means "simulated or actual (i) showing of the human genitals in a state or sexual stimulation or arousal; or (ii) acts of masturbation, sexual intercourse, sodomy, bestiality, necrophilia, sadomasochistic abuse, fellatio, cunnilingus; or (iii) fondling or erotic touching of human genitals, pubic region, buttocks or female breasts." §10.15(6)(g)-2-E.*

RESPONSE: Undisputed.

102.      *"Specified anatomical areas" means "(i) human genitals, pubic region, buttocks, anus, or the areola of a female breast or breasts less than completely and*

*opaquely covered by clothing; or (ii) human male genitals in a discernibly turgid state,*

*even if opaquely covered by clothing." §10.15(6)(g)-2-F.*

RESPONSE: Undisputed.

103.   *An Adult-Oriented Establishment is a permitted use in the I-1*

*(Limited Industrial) District and in the I-2 (General Industrial) district. §10.15(6)(b)-*

*36; §10.15(7)(b)-1.*

RESPONSE. Undisputed.

104.   *The ordinance provides that a customer entrance to an Adult-Oriented*

*Establishment shall not be located within 500 feet of a residence zoning district*

*boundary located within the City of Schofield or within 500 feet of the city limits.*

*§10.15(6)(g)- 2-G(i).*

RESPONSE:  Disputed.  The Ordinance provides:

> G.   An "adult-oriented establishment" must meet the following criteria:
>
> (i)     Any customer entrance to the business shall not be located within 500 feet, as measured in a straight line, of a residence zoning district boundary located within the City of Schofield or within 500 feet of the city limits; and

(Hoff Affidavit, p. 4, ¶ 4(f) & Exhibit SJ-13).

105.   *The ordinance provides that a customer entrance to an Adult-Oriented*

*Establishment shall not be located within 1000 feet of any customer entrance to any*

*existing Adult-Oriented Establishment. §10.15(6)(g)-2-G(ii).*

RESPONSE: Disputed.  The Ordinance provides:

> G.   An "adult-oriented establishment" must meet the following criteria:
>
> (ii)   Any customer entrance to the business shall not be located within 1.000 feet, as measured in a straight line, of any customer entrance to any existing adult-oriented establishment.

(Hoff Affidavit, p. 4, ¶ 4(f) & Exhibit SJ-13).

106.   *The ordinance provides that all ordinances or parts thereof in conflict with it are repealed. §10.15(6)(g)-3.*

RESPONSE:  Disputed only to the extent Schofield Code Sec. 16.03(8) , provides:

> It is not, nor has it ever been, the intent of the Schofield City Counsel to repeal this ordinance or create conflict with this ordinance by enacting any zoning ordinances that include Establishments Dealing in Alcoholic Beverages which are licensed under this chapter of the ordinances and the land use provisions of chapter 10 of the Schofield Code of Ordinances. Conflicts, if any, between this ordinance and any other provisions addressing the same or similar subject matter are to be harmonized and reconciled to effect the purposes and policies of the laud use and licensing regulations.

(Hoff Affidavit, p. 4, ¶ 4(d) & Exhibit SJ-11).

107.   *The ordinance provides that if any part of the ordinance is found to be unconstitutional, "such decision shall effect (sic) the validity of any part of this ordinance." §10.15(6)(g)-4.*

RESPONSE: Disputed only to the extent that cited language of the Ordinance

59

reflects a transcription error that is to be corrected by the City of Schofield pursuant to

the statutory requirements of Wis. Stat. Sec. 62.23.  (Freeburg Deposition, p. 53-54).

     Dated at Wausau, Wisconsin this 19th day of August, 2004.

ZALEWSKI, KLINNER & KRAMER,
LLP, Attorneys for the Defendant, City of
Schofield

_____
Michael J. Roman
Wisconsin State Bar No. 1020648

Address:
1500 Merrill Avenue
P.O. Box 1386
Wausau, WI 54402-1386
(715) 675-1999 phone
(715) 675-7698 fax